UNITED STATES of America, Appellee,

v.

George GOTCHIS, Defendant-Appellant.

No. 1438, Docket 86–1139.

United States Court of Appeals,
Second Circuit.

Argued July 15, 1986.
Decided Oct. 14, 1986.

Gary D. Weinberger, Asst. Federal Public Defender, District of Connecticut (Thomas G. Dennis, Federal Public Defender for the District of Connecticut, of counsel) for defendant-appellant.

Holly B. Fitzsimmons, Asst. U.S. Atty., District of Connecticut (Stanley A. Twardy, Jr., U.S. Atty., for the District of Connecticut, of counsel) for appellee.

* The Honorable José A. Cabranes, United States District Judge for the District of Connecti-

Before WINTER and MAHONEY, Circuit Judges, and CABRANES, District Judge.*

MAHONEY, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the District of Connecticut, Blumenfeld, J., entered after a jury trial, convicting defendant George Gotchis of possession of cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) (1982). Judge Blumenfeld sentenced Gotchis to eighteen months in prison to be followed by a three-year special parole term. On appeal, Gotchis argues that the district court erred in refusing to strike suppression hearing testimony of a Drug Enforcement Administration agent who failed to produce his notes concerning information received from another DEA agent; that the court improperly admitted at trial certain "biographical" information obtained from the defendant after he had received *Miranda* warnings and indicated that he wished to remain silent; and that the prosecutor improperly shifted the burden of proof to the defense by comments in summation on the lack of evidence supporting the defense theory that the cocaine found on Gotchis was intended for "personal use." Because we reject each of these arguments, we affirm.

## BACKGROUND

On August 17, 1985, George Gotchis was arrested at Bradley International Airport, near Hartford, Connecticut, with eight ounces of pure cocaine on his person. DEA Agent Louis Candell, who arrested Gotchis, had received from a second DEA agent, Art Cash from Miami, a description of a man who was believed to be bound for Bradley Airport on a flight from Fort Lauderdale, Florida and to be carrying cocaine in his pants. Cash's description was detailed: The man, named George, was said to have a large build, a potbelly, and light brown hair and to be wearing sun-

cut, sitting by designation.

glasses, blue slacks, cream-colored loafers, a light-colored pullover, which was not tucked into his slacks, and a large ring on his little finger. Cash had received his tip in turn from an unidentified informant upon whom the DEA and Candell himself had previously relied. At the airport, Candell spotted Gotchis, who had arrived on the designated flight and who precisely fit the description Cash had given him. After observing Gotchis' behavior, which tended to confirm his suspicions that Gotchis was indeed the courier Cash had described, Candell stopped Gotchis and, with Gotchis' permission, asked him some questions. Gotchis' responses, which were implausible and evasive, augmented the indicia of possible criminal activity.[1] Candell then placed Gotchis under arrest.

Candell, two state troopers, and another DEA agent took Gotchis to a state police office at the airport, where they strip-searched him and discovered two packages of cocaine in his underwear. Candell then gave him the warnings required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Gotchis said that he did not wish to answer questions. However, when Candell later proceeded to ask Gotchis for certain information about his identity and background, including whether he was employed, Gotchis answered the questions and told Candell that he had been unemployed for eight years. He offered the explanation that he supported himself with gambling winnings. During his subsequent ride to jail, Gotchis asked an agent who the "rat" was. Candell testified that when the agent professed

not to understand the question, Gotchis rejoined: "There must have been a 'rat,' or how would you have known?"

Gotchis moved before trial to suppress the cocaine, which he claimed had been discovered as a result of an unlawful arrest, and to suppress his post-arrest statements, including the background data Candell had elicited, which Gotchis claimed had been procured in violation of his *Miranda* rights. Having learned at the suppression hearing that Candell had taken notes when Cash had described the suspected courier to him, Gotchis requested the notes and was granted a week's recess in order to give Candell an opportunity to find and produce them. Candell was unable to find the notes, which he claimed to have misplaced. Gotchis then filed a motion to suppress Candell's testimony, which was denied. Gotchis' motions to suppress the cocaine and the post-arrest statements were denied, as well.

At trial, the prosecution's case depended on proof of intent to distribute, Gotchis having conceded possession of the cocaine. Each side presented expert testimony tending to show the likelihood—or the improbability—that the amount and purity of the cocaine in Gotchis' possession would be found in the possession of someone who might have intended to consume the drug himself rather than to distribute it. In her summation, the prosecutor emphasized that apart from the testimony of one expert, who was unacquainted with Gotchis but who testified hypothetically that a heavy user might consume eight ounces of pure cocaine in a month, Gotchis had presented

1. Other than the tip, the circumstances giving rise to probable cause are not at issue in this appeal. We include here a summary of the additional indications of probable criminal activity to complete the story:

Candell testified at the suppression hearing that the man who fit Cash's description of the courier appeared nervous. He lingered in the gate area and pretended to make a telephone call while seeming to scrutinize the crowd. He then lingered around the baggage claim area, but left without a suitcase and proceeded toward the parking lot. At that point Candell stopped the man, who agreed to answer questions. He surren-

dered his airline ticket, which bore the name "J. Corcoran." When Candell asked him his first name, he replied that his name was George Gotchis. He attempted and then abandoned an explanation for his use of an assumed name. Candell then asked him about the baggage claim stub stapled to his ticket, and he told Candell that he was going to the parking lot to get his car and would then return for his bag. Observing that the airport facilities did not accommodate baggage retrieval in that manner, Candell then told Gotchis that he believed he was in possession of illegal drugs. He placed Gotchis under arrest and took him to the police office.

no evidence at all to show that he was a cocaine user; the prosecutor specified witnesses that Gotchis might have called, but did not call, to provide testimony as to his consumption of the drug. In addition, the prosecutor called attention to Gotchis' long-term unemployment to support the inference that Gotchis intended to sell the cocaine.

Gotchis argues on appeal that the district court erred in refusing to strike Candell's testimony at the suppression hearing after Candell failed to produce the notes he had taken during his conversation with Cash, and that both the arrest of Gotchis and the related seizure of cocaine were therefore invalid; that the district court erred in refusing to suppress the statements Gotchis had made in response to Candell's "biographical" questions, in violation of Gotchis' *Miranda* rights; and that in her closing statement the prosecutor violated Gotchis' due process rights by shifting the burden to him to show that he was innocent of any intent to distribute.

## DISCUSSION

### I

Because Candell's notes were unavailable to corroborate his testimony about what Cash had told him, Gotchis argues that the prosecution failed to pass the "totality of the circumstances" test to show probable cause to arrest him under *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Cash's description of the suspected courier, which focused Candell's attention on Gotchis, was of course the single most important of the "circumstances" contributing to the "totality" justifying Gotchis' arrest. Gotchis does not contend that the tip was by its nature unreliable or that, in combination with the other circumstances attending Gotchis' arrest, it did not give rise to probable cause. He argues instead that since Candell took notes when Cash passed along the description of the suspect, Candell's testimony about the tip was incompetent without the notes. He relies for this argument on Rule 26.2(a), Fed.R. Crim.P. (incorporating the substance of the

Jencks Act, 18 U.S.C. § 3500, into the Federal Rules), which authorizes a party to compel production of any "statement" made by a witness other than the defendant if the statement is in the witness's possession and concerns subject matter about which the witness has testified. The Rules define "statement" as, *inter alia*, "a written statement made by the witness that is signed or otherwise adopted or approved by him," Rule 26.2(f)(1), Fed.R.Crim.P., and it is under this definition that the defendant presents Candell's notes as candidates for compulsory production. In the event that a party elects not to produce such a statement, "the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the government who elects not to comply, shall declare a mistrial if required by the interest of justice." Rule 26.2(e), Fed.R.Crim.P. Candell's notes were of course not in his possession; however, the rule requires the government to preserve statements as well as to produce them. *United States v. Sanchez*, 635 F.2d 47, 65 (2d Cir.1980); *United States v. Bufalino*, 576 F.2d 446, 449 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978).

■ Thus, our disposition of this issue depends upon whether Candell's rough notes recording Cash's tip constituted a "statement" under the definition set forth in the rule. We hold that they did not. Rule 26.2(f)(1), it seems to us, contemplates writings that the witness has in some manner vouched for. Candell, who apparently just wrote down what Cash told him, did not sign, approve, or adopt the notes. He was in no position when he took the notes to vouch for the accuracy of Cash's tip. Although he later acted on the information Cash had given him, nursing the belief or hope, no doubt, that the information was accurate, he did not thereby "adopt" Cash's description of the suspect in any way we think the rule embraces. Insofar as Gotchis would seek to show by means of the notes that Candell's recollections of Cash's description at the time of the suppression

hearing deviated from the description as Candell originally transcribed it, his argument fails for similar reasons. Candell in no way indicated an intent to be held accountable for the content of his rough notes. We think such an indication is necessarily implied by the terms "signed or ... adopted or approved." The terms are otherwise surplusage, and any writing at all that pertained to the witness's testimony would qualify. To extend the rule to cover rough notes would, moreover, be unwise as a matter of public policy; in the face of such an extension of the rule, agents might simply stop taking notes and attempt instead to rely solely on their memories. In the absence of any indication that the rule was intended to cover such writings as ·Candell's notes, we are not prepared to encumber every agent in receipt of a tip with a choice between composing a report he is willing to approve or adopt or refraining altogether from taking notes.

We do not think that *United States v. Sanchez,* 635 F.2d 47 (2d Cir.1980), calls for a contrary ruling. There we held that where an informant testified at trial, the notes she had prepared for an agent, written on five or six sheets of hotel stationery, were producible along with other reports she submitted about her investigation. We observed that such notes might be "vital to ... test the witness's recollection or undermine his credibility," *id.* at 66, and noted the different treatment accorded agents' notes, which the agents need not retain after reducing them to formal reports. *Id.* at 66 n. 20. Here, apparently, there was no formal report incorporating the notes. But neither were there any notes in the nature of a draft report. We do not think *Sanchez* covers the rough notes Candell took under either of the standards it sets forth, because Candell's notes were apparently neither intended to be incorporated into a report nor to stand alone as a substitute for or supplement to a formal report.

■ Because we hold that Candell's notes were not statements under the rule, we need not address the consequences of the government's failure to produce them.

We note, however, that sanctions would probably have been inappropriate in this case even if the notes had been of the type covered by the rule. When there is no evidence that the government deliberately destroyed a statement, the proper inquiry is "whether the defense was so greatly prejudiced by the unavailability ... at the trial as to require the imposition of sanctions against the Government." *United States v. Miranda,* 526 F.2d 1319, 1328 (2d Cir.1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976). As the government contends, Gotchis could have averted any arguable prejudice by seeking to call Cash as a witness. Although that argument seems at first inspection to be undercut by the government's failure to tell Gotchis about Cash or about Candell's notes prior to the suppression hearing, Gotchis could have tried to call Cash during the week before suppression was ruled on, while Candell was trying to find his notes. It would follow that the defense was not so greatly prejudiced by the unavailability of the notes as to warrant sanctions even if we were to deem the notes a "statement" under the rule.

## II

■ Gotchis next argues that Candell violated his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by asking him questions "under the guise of 'biographical data'" after Gotchis had indicated that he wished to remain silent. In addition to asking Gotchis for his date of birth, address, and telephone number, Candell asked Gotchis what he did for a living. Gotchis replied that he had been unemployed for eight years. That statement turned out to be incriminating, because it supported the inference that Gotchis intended to sell the cocaine.

The government counters that Candell's routine questions were permissible under our analysis in *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109 (2d Cir.1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). In *Hines,* a police officer asked the suspect, who had been

accused of rape and who had not yet received his *Miranda* warnings, several questions about his identity and background. Apparently without realizing that the answer might be incriminating, the officer included a question about the suspect's family and marital status, and the suspect told the officer in reply that he had been married for eleven years and had two children. As it happened, the rapist had told his victim during the assault that he had been married for eleven years and had two children. The seemingly insignificant data thus turned out to be relevant to the identification of the defendant as the rapist.

Noting that such data "may in a particular context provide the missing link required to convict," *id.* at 1112, we nevertheless held it admissible under *Miranda.* In *Miranda,* we reasoned, despite the breadth of its language, "the Supreme Court was concerned with protecting the suspect against interrogation of an investigative nature rather than the obtaining of basic identifying data required for booking and arraignment." 521 F.2d at 1112–13. Routine questions about a suspect's identity and marital status, ordinarily innocent of any investigative purpose, do not pose the dangers *Miranda* was designed to check; they are rather the sort of questions "normally attendant to arrest and custody," *see Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). As in *Hines,* the information requested here— whether Gotchis was employed—falls within the benign category of "basic identifying data required for booking and arraignment." Indeed, as we observed in *Hines,* one of our reasons for allowing questions designed to procure such "basic identifying data" is "to permit the magistrate to de-

termine the amount of bail to be fixed," 521 F.2d at 1112, a consideration that would justify the particular question asked of Gotchis. It is true, as Gotchis argues, that lack of employment may evince intent to distribute in a particular case. But since procurement of employment data would in most instances be as innocent and as useful for purposes of booking and arraignment as procurement of data about a suspect's marital status, we decline to create an exception forbidding routine questions about employment when the defendant is suspected of intent to distribute drugs. We conclude that the trial court did not err in admitting Gotchis' response to Candell's inquiry.[2]

### III

Gotchis argues finally that the prosecutor shifted the burden to Gotchis to disprove an element of the offense—*i.e.,* the intent to distribute—by emphasizing in her summation Gotchis' failure to produce evidence that he was a cocaine user. Stressing the absence of evidence of drug paraphernalia in Gotchis' possession, the absence of observable physical symptoms indicating his drug use, and the absence of expert medical testimony about Gotchis himself, she invited the jury to infer that Gotchis intended to sell rather than to consume the cocaine. As Gotchis summarizes in his brief:

> The prosecutor argued to the jury that George Gotchis either intended to use the cocaine himself or to distribute it to others; the amount, purity and value of the cocaine in the possession of an unemployed man implied an intent to distrib-

---

**2.** In his reply brief, Gotchis does not take issue with the government's statement that:

> even if the information were improperly obtained on the evening of arrest, the same information about defendant's lack of employment was proffered to the court on the defendant's behalf at his bond hearing August [sic] 19.

It thus appears that the information may have been admissible at trial under the independent source or inevitable discovery exception

to the exclusionary rule, *see United States v. Fisher,* 700 F.2d 780 (2d Cir.1983); *United States v. Alvare-Porras,* 643 F.2d 54 (2d Cir.), *cert. denied,* 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981), issues we need not reach in view of our conclusion that the questions Candell asked were not investigative in nature. In any event, the defendant's use of the information for his own purposes in a routine bond hearing underscores the innocuous character of the inquiry eliciting it.

ute; and if George Gotchis were a user he could have called witnesses to that fact or otherwise have proven [sic] it.

By way of illustration, the prosecutor suggested particular witnesses Gotchis could have called to testify to his cocaine consumption, such as his mother and his friends. Gotchis concedes, as he must, that the government may properly invite the jury to infer intent to distribute from the "amount, purity and value of the cocaine in the possession of an unemployed man." *See, e.g., United States v. Gaviria,* 740 F.2d 174, 185 (2d Cir.1984); *United States v. Valdovinos,* 558 F.2d 531, 534–35 (9th Cir.1977). Relying primarily on *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), he thus objects only to the government's references to his failure to bring forth evidence showing that possession of the cocaine in his case could be explained by his own use of the drug.

*Sandstrom* and *Francis,* in our view, do not assist Gotchis at all. In *Sandstrom,* a case in which intent was the only substantive issue at trial, the defendant had been charged with "purposely or knowingly" causing the victim's death. The Supreme Court invalidated the trial court's instruction to the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." The Court reasoned that the jury could have interpreted the instruction as conclusive, once it had found the defendant's acts voluntary, or as a mandatory rebuttable presumption that shifted the burden of persuasion, once it had found additional facts that would not by themselves have established intent. 442 U.S. at 517, 99 S.Ct. at 2455–56. The Court thus rejected the government's argument that the instruction would necessarily be interpreted by the jury as either a permissive inference or a rebuttable presumption that would shift the burden of production only. "They were not told that they had a

choice, or that they might infer that conclusion; they were told only that the law presumed it." *Id.* at 515, 99 S.Ct. at 2454. *Francis,* which also treated instructions bearing on the intent element in a murder charge, arguably extended the *Sandstrom* holding, since in *Francis* any presumption created by the instruction was clearly rebuttable and shifted the burden of persuasion at most. Still, the Court took pains to contrast such a presumption with a "permissive inference"—which "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." 105 S.Ct. at 1971.

■ Apart from the different considerations that might apply in determining the burden-shifting dangers posed by a prosecutor's argument, as opposed to a trial court's instructions on the law—considerations to which neither side here adverts in their analyses of *Sandstrom* and *Francis* —we must reject Gotchis's challenge to the summation on the ground that the prosecutor's statements here could not have created the presumption he posits even in the absence of curative instructions.[3] Any presumptions the jurors may have harbored during the summation were of their own creation, following proof at trial of the "amount, purity and value of the cocaine in the possession of an unemployed man." No one suggested that they were required to infer intent from proof of those facts or from Gotchis's failure to advance evidence of an alternative explanation in combination with proof of those facts. No presumptions—"[g]iven the common definition of 'presume' as 'to suppose to be true without proof,'" *Sandstrom,* 442 U.S. at 517, 99 S.Ct. at 2455 (quoting Webster's New Collegiate Dictionary 911 (1974))—were ever presented to them. While it might have been preferable for the prosecutor to have restricted herself to emphasizing the lack of evidence tending to disprove her case, rather than inviting the jury to spec-

---

**3.** The trial court in fact repeatedly advised the jury that the prosecution bore the burden of proof on all issues.

ulate about specified witnesses the defendant might have called, we do not think the latter comments could fairly be interpreted to mean that the defendant had any obligation to produce those witnesses. Any arguable excesses were thus not constitutional errors. As in *United States v. MacKenzie*, 777 F.2d 811 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986), where we held that an instruction addressed to conscious avoidance created only a permissive inference, "*Francis* and *Sandstrom*, the burden-of-proof-shifting cases, are ... clearly inapposite...." *Id.* at 819.

■ Although we reach this result without taking into account this prosecutor's particular need to comment on the absence of evidence to rebut her case, we note that we would place especially undesirable constraints on the government by precluding such comments where defense counsel himself has suggested the alternative theory that the prosecutor then undertakes to debunk. Defense counsel here told the jury that Gotchis had confessed to the agents that he was a user. It was then fair and reasonable, as well as constitutional, for the prosecutor to counter that suggestion with comments about the absence of any evidence to render plausible Gotchis' theory that he intended to consume all the cocaine himself.[4]

We note in conclusion that this sort of argument has been raised and rejected in a Fifth Amendment self-incrimination context, as well. In *United States v. Bubar*, 567 F.2d 192 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977), for example, the defendants claimed that the prosecutor's repeated references

in summation to their failure to rebut elements of the government's case by substantiating their innocent explanations amounted to unconstitutional commentary on their privilege to decline to testify. We held that "[t]he prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case, as well as his failure to support his own factual theories with witnesses." *Id.* at 199 (citations omitted). Only where the evidence in rebuttal is in the control of the defendant alone or where the jury would " 'naturally and necessarily' " interpret the summation in a particular context as a comment on the failure to testify does such a practice violate the defendant's privilege against self-incrimination. *Id.* (citing *United States ex rel. Leak v. Follette*, 418 F.2d 1266 (2d Cir.1969), *cert. denied*, 397 U.S. 1050, 90 S.Ct. 1388, 25 L.Ed.2d 665 (1970)); *see also United States v. Barnes*, 604 F.2d 121, 148 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Lipton*, 467 F.2d 1161, 1168–69 (2d Cir.1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973). Although the due process clause and the self-incrimination clause protect distinct interests, we do not think those differences suggest a markedly different analysis when a prosecutor comments on the defendant's failure to call witnesses. Where a jury would naturally interpret the prosecutor's comments not as a direction to apply a presumption, but rather as an invitation to infer the improbability of the defendant's theory of the case, the comments are not improper.

---

**4.** In responding to a similar claim concerning a far more egregious burden-shifting comment during a prosecutor's summation, this Court analyzed the issue in the following terms:

[Defendant] Cruz also complains of the prosecutor's use of the phrase "[t]he defense ... has to convince you" in his summation. While this phrasing is indefensible, we will not lightly overturn a conviction solely on the basis of a prosecutor's misstatement in summation. This misstatement

was surrounded by statements to the jury, both by the government and by the court, that the burden at all times remained on the government to prove its case beyond a reasonable doubt; a curative instruction by the court was directed specifically toward this misstatement. We conclude that the misstatement, viewed against the entire argument before the jury, did not deprive Cruz of a fair trial. *United States v. Cruz,* 797 F.2d 90, 93 n. 1 (2d Cir.1986) (citations omitted).

The judgment of the district court is affirmed.