**UNITED STATES, Appellee,**

v.

**Carlos REYES, Defendant, Appellant.**

**No. 99–2270.**

United States Court of Appeals, First Circuit.

Heard Aug. 1, 2000.

Decided Sept. 7, 2000.

72

Mary A. Davis, by appointment of the Court, with whom Tisdale & Davis, P.A. was on brief, for appellant.

F. Mark Terison, Senior Litigation Counsel, with whom Jay P. McCloskey, United States Attorney, was on brief, for appellee.

Before TORRUELLA, Chief Judge,

WALLACE,* Senior Circuit Judge, and BOUDIN, Circuit Judge.

TORRUELLA, Chief Judge.

Appellant "Carlos Reyes" was convicted of making a false statement to a government agent, in violation of 18 U.S.C. § 1001(a), after he gave a false name, date of birth, and social security number to a federal law enforcement officer interviewing him for "booking" purposes after his arrest on drug conspiracy charges. Appellant now claims that he was arrested without probable cause and that the officer who booked him violated the familiar warnings requirements established in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We affirm his conviction.

## I. BACKGROUND

The findings of fact proposed by the magistrate judge, and adopted by the district court, accurately reflect the evidence, and we summarize them briefly.

### A. Investigation and Arrest

On April 22, 1999, Special Agent Uri Shafir of the United States Drug Enforcement Administration ("DEA") reported to the scene of a traffic stop near Kennebunk, Maine. A consent search of the stopped vehicle was performed, and 5.75 ounces of cocaine were found behind the vehicle's dashboard. The search also revealed a list of names and phone numbers that were subsequently identified as belonging to known or suspected drug dealers, including Paul Golzbein of 116 Ross Road in Old Orchard Beach, Maine. The driver of the vehicle, René Omar Rosa–Santos, was arrested and later released on bail.

On April 28, 1999, Special Agent Gerard Lee Hamilton, Jr., of the Maine Drug Enforcement Agency ("MDEA") and another agent were surveilling the property located at 116 Ross Road in Old Orchard Beach when Hamilton saw Golzbein, who he rec-ognized from previous law enforcement contacts, enter the house. Approximately one hour later, Hamilton saw a rented van pull into the driveway of the house. A man closely resembling Rosa–Santos got out of the driver's-side door, reached down to retrieve a dark-colored package from under the front of the vehicle, and then got back into the driver's seat. A few minutes later, the man entered the house. Another man left the house a few minutes later and entered a trailer on the property. The man resembling Rosa–Santos left the house a few minutes thereafter, sat in the van for a few moments, and then also entered the trailer. After as little as thirty seconds, the man resembling Rosa–Santos exited the trailer, sat in the van again for several minutes, and then drove away.

Hamilton conducted surveillance of the Ross Road property again on May 7, 1999. On that date, he saw a black extended cab pickup truck pull into and park in the driveway of the house. Three Hispanic-looking men were inside the truck—a driver and two passengers, one of which was appellant. After a minute or two, a woman known to Hamilton as Golzbein's girlfriend came out of the house and spoke briefly to the driver before going back inside. The driver of the truck got out and went to the door of the house, where he again spoke with the woman. He then returned to the truck and sat inside with the two passengers, looking around the area. Shortly thereafter, Golzbein drove into the driveway and parked next to the truck. The woman came out of the house and met Golzbein by the pickup truck. All five individuals, including appellant, then entered the house.

Two or three minutes later, the driver of the truck came out of the house to stand by the truck; he looked around briefly and then reached under the truck about two feet in front of the rear left tire. He withdrew a baseball-sized object and stuffed it down the front of his pants. Another truck entered the driveway, and

* Of the Ninth Circuit, sitting by designation.

the woman motioned for the first driver to enter the house while she spoke with the driver of the second truck for a couple of minutes outside. The woman and the second driver then entered the house together. After several minutes, the second driver left the house.

About three minutes later, the three men from the first truck exited the house. Appellant and the other passenger got into the cab of the pickup while the driver went to the front of the vehicle and again reached underneath it. The driver then got in the truck and sat for several minutes looking around before driving out of the driveway.

Hamilton informed Shafir that the truck was leaving the Ross Road address, and Shafir followed it until it was stopped by local law enforcement officers. Shafir then reached under the front of the vehicle and removed a black bag containing approximately two ounces of cocaine. No other contraband was found in the vehicle or on the truck's occupants, who spoke to each other in Spanish before all being arrested. Appellant was charged with conspiracy to distribute and possess with intent to distribute cocaine, although this charge was later dismissed on the government's motion.

### B. *Booking of Appellant*

After his arrest, appellant was taken to the local police station in Old Orchard Beach. Walter Smith, an agent of the Immigration and Naturalization Service ("INS") assigned to work with the DEA, interviewed appellant for the purpose of "booking" him, *i.e.*, obtaining the information required by the DEA's standard personal history form for administrative purposes. Because the police station had no separate booking room, the interview was conducted in a detective's office.

Before initiating the interview, and having determined that appellant did not speak or understand English, Smith read to the appellant the standard *Miranda* warning, in Spanish, from the *Miranda*

card that Smith carries at all times and, according to his testimony at the subsequent evidentiary hearing, has used as many as one thousand times to inform detained individuals of their *Miranda* rights in Spanish. Expert testimony given at the evidentiary hearing later indicated that Smith's pronounced American accent made his reading of the *Miranda* rights in Spanish difficult to understand. However, at the interview, when asked in Spanish whether he understood the rights read to him by Smith, appellant replied that he did. Smith did not proceed to seek a waiver of appellant's *Miranda* rights; he testified at the evidentiary hearing that he had no intention of substantively questioning appellant, but intended only to obtain the standard required booking information. Smith also informed appellant at this time that lying about the information he was going to ask him for would be a crime. Smith testified at the evidentiary hearing that he so informed the appellant because he suspected that appellant was not a United States citizen and might be in the United States unlawfully.

Smith then proceeded to ask appellant, in Spanish, for the information required on the personal history form. Appellant told Smith that his name was Carlos Reyes, and that he was born in Bayamón, Puerto Rico on August 27, 1950; he also gave Smith a Social Security number. Smith did not ask appellant any questions other than those required by the standard personal history form—nothing about the offense for which appellant had been arrested, nothing about criminal activity in general, and nothing about his immigration status other than the routine information specifically required by the personal history form. At the conclusion of the interview, which lasted less than five minutes, Smith photographed and fingerprinted the appellant and returned him to his cell. Smith had no further contact with appellant.

## C. *Lower Court Proceedings*

Although the drug conspiracy charge against appellant was dropped, appellant was ultimately charged in a one-count indictment of making false statements in violation of 18 U.S.C. § 1001. The indictment alleged that the name, date of birth, and social security number given by appellant were not in fact his.

Before trial, appellant moved to suppress his allegedly false statements to Agent Smith. Appellant argued that the statements should be suppressed because they were obtained pursuant to an arrest that lacked probable cause and because they were obtained in violation of *Miranda.*

The magistrate judge conducted an evidentiary hearing on September 13, 1999. Based on the testimony given there, and also on other evidence properly admitted, the magistrate judge concluded and recommended to the district court that the motion to suppress should be denied, because the arrest was supported by probable cause and because the questions asked by Smith were subject to the "booking exception" to *Miranda*'s warning requirement. *See United States v. Reyes,* Crim. No. 99–45 (D. Maine filed Sept. 16, 1999) (Cohen, M.J.). The magistrate judge's recommendation was adopted by the district court on October 29, 1999. The district court noted that it had made a *de novo* determination on all matters and concurred with the magistrate's conclusions despite an error by the magistrate concerning the appropriate basis for sustaining the officers' determination of probable cause. *See United States v. Reyes,* Crim. No. 99–45 (D. Maine filed Oct. 29, 1999) (Hornby, C.J.).

A jury convicted the appellant of violating 18 U.S.C. § 1001 on November 9, 1999, and appellant was immediately sentenced to "time served." He now appeals his conviction and the denial of his motion to suppress.

## II. *LAW AND APPLICATION*

■ Appellant makes the same arguments before us that he made to the magistrate judge and to the district court. Our review is plenary, *see United States v. Meade,* 110 F.3d 190, 193 (1st Cir.1997) (plenary review for probable cause determination); *United States v. Shea,* 150 F.3d 44, 47 (1st Cir.1998) *(de novo* review of district court's application of *Miranda* ), and we have independently examined the record with care. Based on that independent review, we agree with the conclusion of the lower courts and affirm the denial of the motion to suppress and appellant's conviction.

### A. *Appellant's Arrest Was Supported By Probable Cause*

■ As the magistrate judge correctly stated in his recommendation, we determine whether an arrest was supported by probable cause using a "totality of the circumstances" standard. *See United States v. Torres–Maldonado,* 14 F.3d 95, 105 (1st Cir.1994). Under this standard, the government bears the burden of establishing that, at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a reasonable person in believing that the individual had committed or was committing a crime. *See id.* We note that this does not require the government to present evidence sufficient to convict the individual, but merely enough to warrant a reasonable belief that he was engaging in criminal activity. *See id.*

■ We agree with the magistrate judge and the district court that the officers who arrested appellant had probable cause to do so. While it is established law that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause," *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the known circumstances tying appellant to the drug conspiracy for which he was arrested were substantially more than

a "mere propinquity" to another suspect. Unlike in *Ybarra,* where the defendant was arrested based solely on his presence in a public place (a tavern), appellant here was seen in a private vehicle and entering and exiting a private residence with known and suspected drug dealers. While this association might not alone give rise to probable cause, the officers were plainly reasonable in considering it, because "[w]e do not think officers in the field are required to divorce themselves from reality or to ignore the fact that 'criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences.'" *United States v. Martinez–Molina,* 64 F.3d 719, 729 (1st Cir.1995). We think that such characterization is particularly appropriate where the criminal activity (in this case, a suspected criminal conspiracy) takes place in the small and private confines of a pickup truck cab or a residential dwelling. In this case, we are persuaded that the officers were reasonable in believing that appellant's presence during and participation in such suspicious activities as the orchestrated entrances into and exits from the house, and the minutes spent in the truck looking around, were nether innocent nor ignorant. The government's evidence is especially compelling given the fact that the driver of the pickup truck stood in front of the vehicle and reached under it, in a way consistent with prior suspected drug activity observed by Hamilton at the Ross Road address, while appellant was sitting in the cab not more than four or five feet away and facing in that direction. Under the totality of the circumstances, therefore, we conclude that the officers had probable cause to arrest him for conspiracy to distribute and possess with intent to distribute cocaine.

**B. *Appellant's Statements Were Not Obtained in Violation of Miranda***

█ As the Supreme Court has recently reaffirmed, statements made by a criminal defendant while in police custody are admissible evidence at his subsequent trial only if the defendant was first warned that he has "'the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Dickerson v. United States,* —— U.S. ——, ——, 120 S.Ct. 2326, 2331, 147 L.Ed.2d 405, —— (2000) (quoting *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602). Once a defendant is informed of these rights, he may of course waive them, *see United States v. Palmer,* 203 F.3d 55, 60 (1st Cir.2000), *cert. denied,* —— U.S. ——, 120 S.Ct. 2756, 147 L.Ed.2d 1018 (2000), but if he does not do so, the police are prohibited from interrogating him and any statements obtained in violation of this rule will be excluded from evidence at trial, *see United States v. Ortiz,* 177 F.3d 108, 109 (1st Cir.1999).

█ The United States concedes that Agent Smith did not obtain a *Miranda* waiver from appellant before interviewing him for the purpose of completing the personal history form, although he did read appellant his *Miranda* rights. Appellant's contention is that, absent such a waiver, his statements were obtained in violation of *Miranda* and should have been excluded from evidence at his trial. The government responds, however, that appellant's statements were obtained lawfully because the questions asked by Smith fall within the established "booking exception" to *Miranda* 's warning requirements. *See United States v. Doe,* 878 F.2d 1546, 1551 (1st Cir.1989). Appellant concedes, in turn, that the questions may in a generic sense fall within the scope of the booking exception, but argues that his statements were nonetheless unlawfully obtained because the exception does not apply "where the law enforcement officer, in the guise of asking for background information, seeks to elicit information that may incriminate." *Id.* Although phrased in terms of the officer's intention, the inquiry into whether

the booking exception is thus inapplicable is actually an objective one: whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an incriminating response. *See id.*

Under the circumstances, we conclude that Agent Smith's questions to appellant—requesting his name, date of birth, and social security number—fall within the booking exception to *Miranda*'s warning requirement. We think it significant that Smith asked only those questions indicated on the standard DEA booking form, with no reference whatsoever to the offense for which appellant had been arrested. The booking interview was conducted separate from any substantive interrogation, by a different officer and in a separate room at a separate time, just as we suggested in *Doe* would be typical of legitimate, routine booking interviews. *See id.* Although the record does reflect that Agent Smith suspected that appellant might not be a United States citizen, Smith explicitly disavowed at the evidentiary hearing any intention to question the appellant beyond what was necessary to complete the personal history form.

Furthermore, we think that it would be a rare case indeed in which asking an individual his name, date of birth, and Social Security number would violate *Miranda*. We can imagine situations, of course, that would present a closer case than this one. For example, asking a person's name might reasonably be expected to elicit an incriminating response if the individual were under arrest for impersonating a law enforcement officer or for some comparable offense focused on identity; likewise, asking an individual's date of birth might be expected to elicit an incrim-

inating response if the individual were in custody on charges of underage drinking; and questions about an individual's Social Security number might be likely to elicit an incriminating response where the person is charged with Social Security fraud. In such scenarios, the requested information is so clearly and directly linked to the suspected offense that we would expect a reasonable officer to foresee that his questions might elicit an incriminating response from the individual being questioned. In contrast, the appellant here was being booked on charges of participating in a criminal drug conspiracy, to which his name, date of birth, and Social Security number bore no direct relevance.

We also recognize that individuals under arrest, particularly those who are in fact guilty of some criminal activity, may sometimes feel tempted to lie about even such basic facts as their identities (to which name, date of birth, and social security are all incidental). Law enforcement agents, through their experience, may often be aware of such temptations, and they may even harbor suspicions in some cases that a particular individual is about to lie. However, we cannot ask them to therefore forego all routine procedures and detain an individual without knowing anything about him, not even what to call him in the jail log. In this particular case, the booking officer went so far as to remind the appellant that it would be a crime to give false answers to the booking questions. That warning, together with the *Miranda* warnings, seem to us sufficient and reasonable precaution on the part of the officer, and hardly indicative of an intent to obtain incriminating statements by sidestepping the requirements of *Miranda*.[1]

---

1. Although our "booking exception" analysis completely disposes of appellant's claim, we also consider it noteworthy that this case does not present the danger of coercion that the *Miranda* warnings were designed to prevent. *See, e.g., Miranda,* 384 U.S. at 457, 458, 86 S.Ct. 1602. The evidence showed that appellant was comfortable during his booking interview and showed no hesitation

in his responses to Agent Smith's questions. Furthermore, the booking interview was conducted in accordance with the procedure that we suggested in *Doe* would be typical, "where one officer may book a suspect in one room before another questions the suspect at greater length elsewhere." *Doe,* 878 F.2d at 1551. And the circumstances of appellant's interview certainly stand in sharp contrast to

In sum, we agree with the magistrate judge and the district court that Agent Smith's questions to appellant fall squarely within the booking exception to *Miranda*'s warning requirement.

### III. *CONCLUSION*

For the reasons set forth above, we affirm appellant's conviction and the denial of his motion to suppress evidence.

**Affirmed.**

those surrounding the questioning of the defendants in *Doe*, who were rescued from a sinking vessel on the high seas, chained to the deck of a coast guard vessel, and questioned as to the critical jurisdictional fact of their citizenship *before* any *Miranda* warnings were given to them.  *See id.* at 1548, 1550–51.