# United States Court of Appeals
## For the First Circuit

No. 15-1107

UNITED STATES OF AMERICA,

Appellee,

v.

JORGE SANCHEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Jeffrey W. Langholtz on brief for appellant.
Carmen M. Ortiz, United States Attorney, and Randall E. Kromm,
Assistant United States Attorney, on brief for appellee.

March 23, 2016

**THOMPSON**, <u>Circuit Judge</u>.

## Preface

Jorge Sanchez asks us to undo a district judge's order denying his motion to suppress.  Concluding that we cannot, we affirm.

## How the Case Got Here[1]

One summer evening back in August 2011, Officer Mark Templeman of the Springfield Police Department got a phone call from a confidential informant ("CI," for short).  A Hispanic man standing near a green Ford Taurus on the corner of Main and Calhoun streets had a black semiautomatic handgun in his waistband and crack cocaine in his pocket, the CI said.  And he described the man as medium complected, roughly 5'5" tall, and wearing a white t-shirt and black cargo-style shorts.  Asked by Templeman how he knew about the gun and the crack, the CI replied that he had personally "seen" them.  Templeman knew the CI well, having worked with him since about 2007.  Templeman knew the CI's name, phone number, and address, for example.  And the CI had been a big help to police before, having given Templeman tips about street-level drug deals and firearm-possession crimes over the years that led

---

[1] As per usual, we outline the relevant facts as found below, "consistent with record support."  <u>See</u> <u>United States</u> v. <u>Lee</u>, 317 F.3d 26, 30 (1st Cir. 2003).

to arrests and convictions — as far as Templeman knew, the CI had never given him false info.

Responding to the tip, Templeman and other officers headed to the scene in several cars. Templeman drove alone, arriving at the locale about five minutes after the CI's call. There he saw a green Ford Taurus and a man matching the physical description given by the CI. Templeman recognized the man as Sanchez, a suspected gang member he had arrested in 2004 for possessing with intent to distribute heroin and cocaine — an offense that resulted in a conviction, meaning (as Templeman knew) that Sanchez could not legally carry a firearm.

After surveilling the site for about 10 minutes, Templeman (who had binoculars) spied Sanchez put his left hand on his left hip: Sanchez's t-shirt hung over his waistband, and as Sanchez touched this area, Templeman could see the shape of some object underneath the shirt. Sanchez's movement reminded Templeman of how he (Templeman) checks his concealed firearm. As a result of his observations, and based on his training and experience, Templeman believed that Sanchez had a firearm. So he radioed his colleagues, telling them to "move in" and warning them about the gun tucked in the left side of Sanchez's waistband.

Staying in his car, Templeman watched an officer named Kalish close in, pat Sanchez's waistband, and grab the gun.

- 3 -

Someone — the record does not say who — then arrested and cuffed Sanchez. And a search incident to the arrest turned up the crack. The total time from the CI's call to Sanchez's arrest was 15 minutes or so.

During booking, Sergeant Julio Toledo (the booking officer that evening) asked a not-yet-Mirandized Sanchez a series of standard questions about his name, date of birth, social-security number, height, weight, job held or school attended, etc. And when Toledo asked him whether he was employed, Sanchez matter-of-factly answered that he was "a drug dealer." By the way, Toledo played no part in the Sanchez investigation — other than knowing the booking charges, Toledo knew nothing about the case against Sanchez. Also, Toledo had no info suggesting that his asking these standard booking questions might cause Sanchez to incriminate himself. What is more, Toledo did not ask the questions to further the investigation. And he did not ask Sanchez any follow-up questions tied to the "drug dealer" comment — a comment Toledo shared with Templeman after booking.

A federal grand jury indicted Sanchez on three counts. Count 1 alleged that he had possessed cocaine base with intent to distribute. Count 2 alleged that he had possessed a firearm as a convicted felon. And count 3 alleged that he had possessed a firearm in furtherance of a drug-trafficking offense.

- 4 -

Sanchez moved to suppress both the contraband and the drug-dealer statement.  On the contraband issue, he challenged the evidence's admissibility on the ground that no reasonable suspicion justified the "seizure and search" of his "person."  And on the employment-question matter, he contested his answer's admissibility on the basis that Toledo had asked the offending question — before any Miranda warnings — "to elicit an incriminating response," rendering his drug-dealer "confession" involuntary.  The government disagreed with Sanchez on both fronts, insisting that reasonable suspicion did exist to stop and frisk him and that the complained-of question and answer fell outside Miranda's scope.  A district judge held an evidentiary hearing, at which only Templeman and Toledo testified.  And after crediting the key particulars of their accounts, the judge orally denied the motion.

Later, the government voluntarily dismissed counts 1 and 3.  Sanchez then entered a conditional guilty plea to count 2 (the felon-in-possession-of-a-firearm count), reserving his right to appeal the suppression ruling.  And the judge sentenced him to the statutory minimum of 180 months in prison plus 3 years of supervised release.

Which brings us to today, with Sanchez complaining about the judge's refusal to suppress the evidence seized and the comment made that fateful summer evening.

**The Evidence-Suppression Issue**

We start with the evidence-suppression issue. As Sanchez sees it, the judge should have granted his suppression motion because the CI's tip was too "generic" and not "corroborated" enough to supply reasonable suspicion for the stop and the frisk, which made the arrest — based on the evidence seized — "unlawful." We of course review the judge's legal conclusion de novo, accepting his factual findings and credibility calls unless clearly erroneous and viewing the evidence in the light most likely to support his decision. See, e.g., United States v. Martinez, 762 F.3d 127, 130-31 (1st Cir. 2014); United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011); see also United States v. Coccia, 446 F.3d 233, 237 (1st Cir. 2006) (noting that "'we will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it'" (quoting United States v. Garner, 338 F.3d 78, 80 (1st Cir. 2003))). Keeping these principles in mind, we see no constitutional violation.

Search-and-Seizure Basics

The Fourth Amendment declares that searches and seizures shall not be "unreasonable." See U.S. Const. amend. IV. Cases

- 6 -

often treat searches without probable cause as "unreasonable." See, e.g., United States v. Lopez, 989 F.2d 24, 26 (1st Cir. 1993). But there are exceptions. The one relevant here says that officers may stop and briefly detain a person if they have reasonable suspicion that criminal activity is afoot, see, e.g., Terry v. Ohio, 392 U.S. 1, 30 (1968); Brake, 666 F.3d at 804 — a standard that requires us to take account of the "totality of the circumstances," see United States v. Arvizu, 534 U.S. 266, 273 (2002); accord United States v. Pontoo, 666 F.3d 20, 29 (1st Cir. 2011). And officers may pat-frisk the person too if they have reason to believe he is "armed and dangerous." See, e.g., Pontoo, 666 F.3d at 30. The high Court refers to these police actions as "Terry stops" and "Terry frisks." See Florida v. J.L., 529 U.S. 266, 272-73 (2000). So we will too.

### No Terry-Stop Problem

Reasonable suspicion can be established by an informant's tip if the tip possesses sufficient "indicia of reliability," see id. at 270 — on this both sides agree. And the tip here fits the bill, despite what Sanchez argues. Just consider the following:

Templeman knew the CI's tips had proven reliable in the past — which is a very big deal because an informant's "past reliability . . . is a significant factor permitting reliance on

- 7 -

information that would not otherwise be sufficiently corroborated." See United States v. Jones, 700 F.3d 615, 621-22 (1st Cir. 2012). Actually, Templeman knew more than just the CI's reliability. He knew the CI's identity — after working with him for years, Templeman knew the tipster's name, phone number, and address. And the reason that matters is because it is a crime to materially lie to law-enforcement agents — so knowing the CI's name, for example, ups the chance that agents can come down hard on the tipster if the tip is false, and that threat ups the chance that the tip is reliable. See J.L., 529 U.S. at 270 (indicating that unlike an anonymous informant's tip, a "tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" is much more trustworthy). Also, the CI gave detailed, not general, info, as he spoke about Sanchez's physical appearance, location, gun possession, and crack holding — and the CI had seen the gun and crack with his own eyes, which gave him a clear basis of knowledge for the tip. See Illinois v. Gates, 462 U.S. 213, 234 (1982) (explaining that when an informant observes a crime "first-hand," that "entitles [the] tip to greater weight than might otherwise be the case").

Seeking to avoid all this, Sanchez analogizes his case to J.L. There, officers used an anonymous tip — that "a young

black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" — to justify a Terry stop. Officers could not verify the tipster's credibility (obviously, because they did not know who he was). Plus, aside from the tip, which did not describe how the tipster knew the male was armed, officers had zero reason to suspect the male of any illegal activity — they "did not see the firearm," for example, "and [the male] made no threatening or otherwise unusual movements." J.L., 529 U.S. at 268. With concerns about the tipster's credibility and accountability uppermost in the Court's mind, J.L. held that the tip — without more — could not justify the Terry stop.

From what we have just said it is obvious that Sanchez can get no mileage from J.L.: Not only did the CI here say how he knew about Sanchez's gun and crack possession. And not only did Templeman see Sanchez move in a way consistent with his having a gun (i.e., touching an object hidden in his waistband), which Templeman knew Sanchez could not legally possess. But unlike the tipster in J.L., our CI was not (repeat, not) anonymous, see United States v. Romain, 393 F.3d 63, 73 (1st Cir. 2004) (distinguishing J.L. on similar grounds), meaning Templeman could gauge his credibility and hold him accountable if necessary.

The net result is that given the universe of circumstances, the Springfield police had reasonable suspicion to Terry-stop Sanchez. Enough said about that issue.

No Terry-Frisk Problem

Sanchez also protests that officers had no business conducting a Terry frisk, essentially arguing that they had no "urgent" need to pat him down because they had no reason to perceive the situation to be so dangerous as to justify even a limited search. Call us unconvinced.

Again, the CI saw Sanchez's gun and crack. Surveilling the site, Templeman remembered that he had previously busted Sanchez for possessing drugs with intent to distribute. He then noticed Sanchez reach for his waistband. Also, he (in his words) "observed a hard object within" Sanchez's "grasp and underneath" the "[t]-shirt." And based on his experience, he reasonably interpreted Sanchez's reaching action as suggesting that Sanchez had a gun. Taking everything together, we believe the police had a sufficient "security-related" basis to pat Sanchez down for a weapon. See United States v. Arnott, 758 F.3d 40, 45 (1st Cir. 2014) (noting too that "[t]he connection between drugs and violence is, of course, legendary"); see also United States v. Alston, 112 F.3d 32, 33-34 (1st Cir. 1997) (concluding that "a tip from a previously reliable informant" — that a man near a particular

- 10 -

street was carrying a gun — justified the "pat-down search"); United States v. Trullo, 809 F.2d 108, 113-14 (1st Cir. 1987) (finding a Terry frisk justified in part by officer's concern that a bulge in defendant's clothing was a weapon).

Ever persistent, Sanchez tries to throw cold water on Templeman's interpretation by calling it nothing more than a pure "hunch." He is right that reasonable suspicion is something more than a mere hunch. See Arnott, 758 F.3d at 44 (explaining that "[r]easonable suspicion" lies in the area between "a naked hunch" and "probable cause"). But the problem for him is that the judge essentially rejected the pure-hunch theory — after all, the judge specifically credited Templeman's experience-based interpretation. And we cannot say that the judge clearly erred in doing so. Cf. Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 46 (1st Cir. 2013) (noting that clear error means the judge's action was "wrong with the force of a 5 week old, unrefrigerated, dead fish" (quoting S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001))).

The bottom line is that we see no need to reverse the judge on the Terry-frisk issue, just as we saw no need to reverse the judge on the Terry-stop issue. So we affirm the judge's refusal to suppress the evidence against Sanchez.

- 11 -

**Statement-Suppression Issue**

As we said earlier, Sanchez also attacks the judge's decision not to suppress his drug-dealer response to Toledo's employment-status question. To hear him tell it, Toledo extracted his response during a custodial interrogation without benefit of Miranda warnings. Once again we review the judge's factual findings for clear error and his legal ruling de novo. See, e.g., United States v. Hinkley, 803 F.3d 85, 90 (1st Cir. 2015). And once again we affirm.

## Miranda Basics

Miranda's familiar warnings (e.g., that you have the right to remain silent and that anything you say can be used against you) are required for custodial interrogations — it is the combination of "custody" and "interrogation" that warrants the giving of these warnings. See, e.g., Miranda v. Arizona, 384 U.S. 436, 473-79 (1966); United States v. Molina-Gómez, 781 F.3d 13, 21-22 (1st Cir. 2015). Neither side disputes that Sanchez was in custody at the time of booking (he was an arrestee at that point, remember). But they fight like mad over whether Toledo's employment query constituted interrogation. So we focus our energies on that issue.

Interrogation for Miranda purposes includes "any words or actions on the part of the police . . . that the police should

- 12 -

know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980); accord United States v. Davis, 773 F.3d 334, 339 (1st Cir. 2014); cf. generally Miranda, 384 U.S. at 478 (making the commonsense point that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence"). An exception exists for routine booking questions seeking background info, such as the "suspect's name, address, and related matters." See United States v. Doe, 878 F.2d 1546, 1551 (1st Cir. 1989); accord United States v. McLean, 409 F.3d 492, 498 (1st Cir. 2005); see also United States v. Reyes, 225 F.3d 71, 76-77 (1st Cir. 2000) (noting that questions asked at booking regarding a defendant's date of birth and social-security number fit comfortably within the purview of this exception, given the circumstances of that case). Driving this "booking exception" (as the cases call it) is the idea that questions of this sort "rarely elicit an incriminating response" — "even when asked after an arrest." See Doe, 878 F.2d at 1551; see also Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (plurality opinion) (noting that the booking exception "exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services" (internal quotation marks omitted)). There is an exception to this exception, however: the booking exception

- 13 -

does not apply "where the law enforcement officer, in the guise of asking for background information, seeks to elicit information that may incriminate."  Doe, 878 F.2d at 1551.  Ultimately, the booking exception's applicability turns on an "objective" test that asks "whether the questions and circumstances were such that the officer should have reasonably expected the questions to elicit an incriminating response," see Reyes, 225 F.3d at 77 — meaning "the officer's actual belief or intent," though "relevant," is in no way "conclusive," see Doe, 878 F.2d at 1551.

## No Miranda Problem

Sanchez does not contest that routine employment questions might fall within the booking exception.  And it is easy to see why.  Years ago we intimated that employment questions could fit within the booking exception, depending on the situation.  See United States v. Duarte, 160 F.3d 80, 82 (1st Cir. 1998) (per curiam) (dicta) (citing United States v. Gotchis, 803 F.2d 74, 78-79 (2d Cir. 1986)).[2]  The idea is that employment questions, "ordinarily innocent of any investigative purpose, do not pose the dangers" that Miranda sought "to check" — the answers to these

---

[2] The police in Duarte read the defendant his Miranda rights twice before asking him about his employment situation.  Id. at 81.  So we had no need to decide whether his answer fell within the booking exception — though we noted, citing Gotchis, that "[a] quick review of the record and caselaw indicate . . . that the exception would apply."  Id. at 82.

- 14 -

questions give the judiciary important info (the info can help with setting a defendant's bail, for example), and thus are so central to the booking and pretrial process that they are usually exempt from Miranda's coverage. See Gotchis, 803 F.2d at 79 (cited with approval in Duarte); see also 18 U.S.C. § 3142(g)(3)(A).[3] Persuaded by this line of reasoning, we now turn Duarte's dicta into holding — i.e., we put routine booking questions about employment (ones not reasonably likely to generate incriminating info) on the list of Miranda-exempt background questions.

Perhaps anticipating what we might do with Duarte (transforming its intimation into binding law), Sanchez argues that the employment question asked here crossed the constitutional line because Toledo posed it "to elicit an incriminating" answer (i.e., he invokes the exception to the booking exception). Not so, we conclude.

As a nonmember of the team that investigated Sanchez, Toledo asked only routine questions to help with the booking process — not to strengthen the case against the arrestee (he did not, for example, ask any follow-up questions when Sanchez said he

---

[3] This section tells judges to consider a defendant's "employment" in deciding whether there are conditions that would reasonably assure he comes to court if bail is granted, see § 3142(g)(3)(A) — the thought being that having a job shows stability and might make him less likely to flee.

was employed as a drug dealer).  And this testimony — which the judge did not clearly err in crediting — supports the conclusion that the booking exception applies.  See Reyes, 225 F.3d at 77 (finding the booking exception applied in large part because (a) "[t]he booking interview was conducted separate from any substantive interrogation, by a different officer and in a separate room at a separate time" and (b) the booking officer "asked only" standard police questions, "with no reference whatsoever to the offense for which appellant had been arrested").  Also, importantly, the circumstances of this case are far removed from those presenting a "closer" question on the exception's applicability.  See id.  These closer-question cases all involve situations where the police asked questions to extract answers "clearly" and "directly" tied to the "suspected" criminal activities.  See id. (noting, by way of illustration, that asking someone to give his social-security number "might be likely to elicit an incriminating response where the person is charged with [s]ocial [s]ecurity fraud").  And Sanchez offers no persuasive basis for us to conclude that there is a similar direct link between the employment question and his suspected offenses.  Cf. generally Gotchis, 803 F.2d at 79 (deeming booking questions about employment permissible in a case where the police arrested defendant for a drug offense).

- 16 -

With that, we uphold the judge's decision not to suppress the statement.

## Wrap Up

For the reasons recorded above, we <u>affirm</u> the judge's refusal to suppress the incriminating evidence and comment.