Jose ROSA, Petitioner–Appellee,

v.

Frank McCRAY, Respondent–Appellant,

and

Eliot L. Spitzer, Respondent.

Docket No. 04–2188–PR.

United States Court of Appeals, Second Circuit.

Argued: Oct. 5, 2004.

Decided: Jan. 27, 2005.

Lawrence T. Hausman, The Legal Aid Society, Criminal Appeals Bureau, New York, N.Y., for Petitioner–Appellee.

Andrew N. Sacher, Assistant District Attorney, Bronx County (Joseph N. Ferdenzi, Assistant District Attorney; Robert T. Johnson, District Attorney, Bronx County, on the brief), Bronx, N.Y., for Respondents–Appellants.

Before: MINER, CABRANES, and STRAUB, Circuit Judges.

Judge STRAUB concurs in part and dissents in part in a separate opinion.

MINER, Circuit Judge:

The question presented is whether, absent *Miranda* warnings, the admission at trial of an unsolicited comment by a defendant to a police officer—volunteered as an additional response to a "pedigree" question during booking—violates the defendant's Fifth Amendment right to be free from self-incrimination.

Respondents-appellants appeal from a judgment entered April 1, 2004, in the United States District Court for the Southern District of New York (Motley, *J.*) granting the application of the petitioner-appellee, Jose Rosa ("Rosa" or "petitioner"), for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. The District Court determined that the constitutional aspect of petitioner's claim had been fairly presented to the state courts and, therefore, that the claim had been exhausted. *Rosa v. McCray*, 2004 WL 736859, at *5–*6, 2004 U.S. Dist. LEXIS 5740, at *14–*18

(S.D.N.Y. Apr. 5, 2004). We agree with that determination. We conclude, however, that the District Court erred in determining that the police detective should have known that his inquiry regarding the natural color of the petitioner's hair was reasonably likely to evoke an incriminating response and, therefore, that *Miranda* warnings should have been given. For the reasons that follow, we hold that the state courts' application of clearly established federal law, as determined by the United States Supreme Court, was objectively reasonable, and, accordingly, the application for a writ of habeas corpus should have been denied.

## BACKGROUND

On September 5, 1997, at approximately 7:25 p.m., Juana Hernandez ("Hernandez") was robbed by two men. Hernandez, who made a living going from restaurant to restaurant selling jewelry, had just left a restaurant in the Bronx when Rosa, along with another man, approached Hernandez. They pushed her up against a car; demanded her bag while pointing a gun into her stomach; and then grabbed her bag and ran away. Hernandez had in her bag at the time of the robbery somewhere between $4000 and $5000 worth of jewelry—an amount representing her entire inventory. After her assailants fled, Hernandez received help from a couple in a car, who drove her to a police station. At the police station, Hernandez met with Detectives José Arroyo ("Arroyo") and Thomas Fitzgerald ("Fitzgerald"). Hernandez provided to the detectives a detailed description of the robbers, including the man with the gun. During that interview, Hernandez told Arroyo that the robber with the gun had brown hair, with the ends slightly lighter. Later that evening, Arroyo and Fitzgerald led Hernandez on an unsuccessful canvass of the area where the robbery had occurred.

At approximately 3:30 p.m. on the following day, September 6, 1997, Hernandez saw Rosa standing on the sidewalk. She identified him as the robber with the gun, despite his hair being a different color (blonde) than that of her assailant (brown). She approached nearby police officers, told them that she had been robbed by Rosa the night before, and gave them Arroyo's business card. The officers took Rosa into custody.

Once Rosa was in custody, Fitzgerald was assigned to the case. Arroyo served as an interpreter for Fitzgerald while Fitzgerald completed an on-line booking sheet. Arroyo asked Rosa a series of "pedigree" questions (pertaining to, for example, Rosa's name, date of birth, age, race, height, weight, eye color, and—the subject of this appeal—hair color). As to Rosa's hair color, Arroyo—noticing that Rosa's hair was bright blonde, including the roots—asked Rosa: "What is your real hair color" Rosa responded: "Brown. I colored my hair yesterday." Arroyo translated Rosa's statement for Fitzgerald.

In an indictment filed on September 18, 1997, a Bronx County grand jury charged Rosa with Robbery in the First Degree, in violation of New York Penal Law § 160.15(4); Robbery in the Second Degree, in violation of New York Penal Law § 160.10(1); and Criminal Possession of Stolen Property in the Fourth Degree, in violation of New York Penal Law § 165.45(1), for the September 5, 1997 robbery of Hernandez. Rosa was convicted in the Supreme Court of the State of New York, Bronx County, following a jury trial, of all counts set forth in the indictment. He was sentenced to concurrent indeterminate terms of imprisonment of seven-to-fourteen years, six-to-twelve years, and two-to-four years on the respective counts.

At trial, the State sought to introduce Rosa's statements, made in response to Arroyo's questioning for completion of the post-arrest booking form, that Rosa's natural hair color was brown and that he had dyed it blonde on the day after the robbery. Defense counsel moved to preclude the statements because the prosecutor had not given Rosa notice, pursuant to New York Criminal Procedure Law § 710.30 (New York's pre-trial notice statute), of their intended use.[1] The prosecutor, citing *People v. Rodney*, 85 N.Y.2d 289, 624 N.Y.S.2d 95, 648 N.E.2d 471 (1995), argued that the statements were within the "pedigree exception" and, therefore, that notice was not required.

The trial judge held an evidentiary hearing, outside the presence of the jury, regarding the admissibility of Rosa's response to Arroyo during the booking process. Arroyo, the only witness to testify at the hearing, testified: that he had spoken with Hernandez the day before his processing interview of Rosa and, at that time, had completed a complaint report that included her description of Rosa's appearance, including hair color; that Arroyo had noted in the complaint report that Rosa's hair color was brown; and that during the processing interview the following day, Arroyo questioned Rosa in Spanish and translated the answers into English for Fitzgerald, who completed the booking sheet. Arroyo further testified that booking sheets include, inter alia, a physical description of the defendant "so [the police] know who he or she is."

During the booking process and while completing the booking form, as Arroyo explained at the hearing, he noticed that Rosa's hair was "bright flaming blonde." This observation led Arroyo to believe Rosa's hair had been dyed. Arroyo asked Rosa: "What is your real hair color?" According to Arroyo, Rosa responded: "Brown, but I colored it yesterday." Arroyo asserted that he did not record Rosa's response but did translate it from Spanish to English for Fitzgerald. Arroyo also testified at the evidentiary hearing that the purpose of asking Rosa's real hair color was to ascertain the correct color of the arrestee's hair for the required administrative report: "You just want to make sure, when I put the hair color down to identify the individual, his hair is really blonde, black and not colored. And his eyebrows were darker color than the hair, so I asked what is his real hair color .... I just wanted to make sure for the report." The booking sheet contained a space to note any "wig/hair dye," but that space apparently was left blank by Fitzgerald. In addition, the space on the form for hair color was marked "BL" for blonde.

Following the evidentiary hearing, the Bronx County Supreme Court ruled that

---

1. Pursuant to section 710.30 of New York's Criminal Procedure Law, the state's failure to give notice of certain types of potentially suppressible statements preclude their use at trial. *See People v. Chase*, 85 N.Y.2d 493, 500, 626 N.Y.S.2d 721, 650 N.E.2d 379 (1995). Section 710.30 provides, in pertinent part:

 1. Whenever the people intend to offer at a trial ... evidence of a statement made by a defendant to a public servant, which statement if involuntarily made would render the evidence thereof suppressible upon motion pursuant to subdivision three of section 710.20, ... they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered. 2. Such notice must be served within fifteen days after arraignment and before trial, and upon such service the defendant must be accorded reasonable opportunity to move before trial, pursuant to subdivision one of section 710.40, to suppress the specified evidence. For good cause shown, however, the court may permit the people to serve such notice, thereafter and in such case it must accord the defendant reasonable opportunity thereafter to make a suppression motion.

Rosa's responses to the booking questions could be admitted into evidence, holding that they fell within the pedigree exception to New York's Criminal Procedure Law § 710.30. The judge stated:

> [I]t's my view that the questions asked by the detective, as testified to at the hearing, were asked for legitimate processing purposes and that their intent was to obtain accurate information, as distinct from incriminating information. The question—all of the questions, but particularly the question regarding hair color, clearly corresponded to portions of the form that were being filled out. I conclude that the questions were incident to ordinary—to the ordinary booking process and did not require notice. I would also note that the color of one's hair is not an element of this crime or of any crime. And when compared to other cases that have discussed what pedigree is, it seems to me that this is well within pedigree, so [Rosa's] motion to preclude is denied.

*Rosa,* 2004 WL 736859, at *1–*2, 2004 U.S. Dist. LEXIS 5740, at *3–*4 (quoting the trial judge's determination).

At trial, Hernandez testified that she had been robbed by two men, and testified to the following facts. One of the men, whom she identified as Rosa, pointed a gun at her during the robbery. His face was six or seven inches from Hernandez when he demanded that she give him her bag, which contained her entire inventory of jewelry. Hernandez looked directly at the petitioner's face and exclaimed: "Don't be bad, please don't take the bag.... My father is sick, I'm working for him." Hernandez testified that Rosa, in response, exclaimed: "Don't look at me, don't look at me ... give me your bag." During the robbery, which lasted about three minutes, Hernandez recognized Rosa as a man that she had seen in the street earlier that same day.

Hernandez also testified that, approximately ten to twenty minutes after the robbery, she met with Arroyo at the police precinct and gave him a description of the armed robber. Hernandez further testified that she had seen Rosa on the street the day after the robbery and pointed him out to police officers, who had then arrested him. No physical evidence linking Rosa to the robbery was introduced.

In court, Hernandez identified Rosa as the man (1) whom she had seen on the street on the day of, but some hours prior to, the robbery; (2) who had robbed her at gunpoint later that day; and (3) whom she had seen, and identified, on the street the day after the robbery. She identified Rosa as being the same person, while acknowledging that his appearance had changed: (1) he had brown hair on the day of the robbery; (2) he had bright blonde hair the day after the robbery; and (3) in court, his hair was (a) darker than it was when he robbed her, and (b) pulled back, whereas it had been down on his forehead during the robbery.

Arroyo testified at trial, as he had during the evidentiary hearing, regarding the collection of pedigree information from Rosa. Arroyo stated that in the post-arrest booking interview of Rosa, Arroyo had asked a series of questions, including the arrestee's name, date of birth, age, race, height, weight, eye color, and hair color. The prosecutor introduced Rosa's responses made to Arroyo during booking and, in summation, argued that the jury should consider Rosa's act of dying his hair "bright blonde the day after he robbed Juana Hernandez" as "evidence of the defendant's guilty conscience [sic]." The trial court charged the jury that it could consider evidence of Rosa's "having dyed his hair and when" as evidence of con-

sciousness of his guilt. The trial court also charged the jury that the identification of Rosa as the perpetrator had to be proven beyond a reasonable doubt.

During deliberations, the jury asked to see the arrest photos, photos of the scene, a street map, the "61 form" (a police arrest form), and "pedigree info." The jury also asked for a reading of Hernandez' testimony and clarification of the four counts charged. The court provided most of the requested materials but explained that neither the "61 form" nor the pedigree form was in evidence. The court instructed the jury to submit another note if it wanted to hear testimony about either subject. The jury later requested, and received, a readback of the testimony of Hernandez, given during cross examination, pertaining to her identification of Rosa. The jury found Rosa guilty of all charges.

Rosa appealed his conviction. The Supreme Court of the State of New York, Appellate Division, First Department, by decision and order dated May 9, 2002, affirmed Rosa's conviction. On the question of whether Rosa's statements should have been precluded, the appellate division held that:

> The People were not required to give notice pursuant to CPL [§ ]710.30 of [Rosa's] statement that he had changed his hair color the day before, made in response to a pedigree question asked as part of routine processing. Since [Rosa's] hair appeared to [Arroyo] to be dyed, [Arroyo's] inquiry as to [Rosa's] actual hair color was reasonably related to administrative concerns, and was neither intended, nor reasonably likely, to elicit an incriminating response.

*People v. Rosa*, 294 A.D.2d 159, 160, 743 N.Y.S.2d 400 (1st Dep't.2002). Rosa then applied for leave to appeal to the Court of Appeals of the State of New York. In a letter supporting the application for leave

to appeal, Rosa acknowledged that "[q]uestions reasonably related to the police's administrative concerns, including pedigree related questions, are generally not suppressible on any Fifth or Sixth Amendment grounds, and, therefore, are not subject to the notice requirements of Criminal Procedure Law section 710.30." The letter went on to argue that "[t]he question falls outside of the pedigree exception, however, if it was reasonably likely to elicit an incriminating response." Rosa's application for leave to appeal to the Court of Appeals was denied on September 18, 2002. *People v. Rosa*, 98 N.Y.2d 732, 749 N.Y.S.2d 482, 779 N.E.2d 193 (2002).

On June 24, 2003, Rosa filed a habeas petition in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 2254, arguing that his convictions were unconstitutional because of the State's use of statements elicited in violation of federal law. Specifically, Rosa argued that Arroyo's question— "What is your real hair color?"—amounted to interrogation designed to elicit an incriminating response, because Arroyo had observed that Rosa's hair appeared to be dyed blonde. Accordingly, the argument continued, "the detective should have known that the question was reasonably likely to elicit an incriminating response." Rosa's ultimate position was that "the state courts' contrary conclusion was based on an unreasonable application of clearly established Supreme Court precedent."

In its decision dated April 1, 2004, the District Court (Motley, *J.*) granted the habeas petition. The court determined that (i) the constitutional aspect of Rosa's claim had been fairly presented to the state courts, and therefore, the claim was exhausted; (ii) Arroyo should have known that his inquiry regarding the natural color of Rosa's hair was reasonably likely to evoke an incriminating response from

Rosa, and therefore, *Miranda* warnings should have been given; and (iii) Arroyo's testimony about Rosa's statement "was the only direct evidence of two important facts: that [Rosa's] real hair color was brown (the color of the robber's hair), and that [Rosa] had dyed his hair shortly after the robbery," and therefore, the alleged error could not be deemed harmless.

The State of New York now appeals the judgment entered by the District Court granting Rosa's petition for habeas corpus.

## DISCUSSION

### I. *Standard of Review*

 We review a district court's decision to grant a writ of habeas corpus de novo. *See, e.g., McMahon v. Hodges & State of New York,* 382 F.3d 284, 288 (2d Cir.2004).

### II. *Exhaustion of State Remedies*

We first examine the State's argument that Rosa did not exhaust his state-law remedies because Rosa did not "fairly present" his federal constitutional claims to the highest state court available. This exhaustion of state remedies is required by 28 U.S.C. § 2254(b) and (c), which provide as follows:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that—
>
> > (A) the applicant has exhausted the remedies available in the courts of the State; or
> >
> > (B)(i) there is an absence of available State corrective process; or
> >
> > (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2) An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

> (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b), (c).

 The exhaustion requirement is not satisfied unless the federal claim has been "fairly presented" to the state courts. "A petitioner satisfies the fair presentation aspect of the exhaustion requirement by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Cotto v. Herbert,* 331 F.3d 217, 237 (2d Cir.2003) (internal quotation marks omitted); *see Daye v. Attorney Gen. of New York,* 696 F.2d 186, 191–92 (2d Cir.1982) (in banc).

 Presenting the essential factual and legal premises of a federal constitutional claim does not require that the petitioner "cit[e] chapter and verse of the Constitution." *Daye,* 696 F.2d at 194. Rather,

> the ways in which a state defendant may fairly present to the state courts the constitutional nature of· his claim ... include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and

(d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.*

Here, the State argues that Rosa did not exhaust his state remedies because he "did not present this issue to the trial court or appellate courts on direct appeal." Specifically, the State argues that Rosa's argument to the trial court and appellate courts was based on state criminal procedure law—that is, that his argument was merely that the at-issue statement should have been precluded, pursuant to New York Criminal Procedure Law § 710.30.

 We agree with the District Court that Rosa exhausted his remedies. Rosa's arguments before the state courts included references to pertinent federal constitutional standards, and the state courts thereby were alerted to the federal constitutional issues. In particular, Rosa cited to the Federal Constitution and to federal case law in his brief to the appellate division. As the District Court correctly noted, Rosa

cited the Fifth and Fourteenth Amendments, in both a point heading and the body of his argument. He discussed and applied *Miranda,* indicating how the state statute operated to protect the *Miranda* rights. He also cited, in support of his Fifth Amendment argument, *Rodney,* a state case employing federal constitutional analysis in a similar fact situation, and quoted from *Rodney* .... [Rosa] used *Rodney* to demonstrate the limits on the pedigree exception, and indicated that the passage in question was followed by citations to [pertinent federal caselaw]. In [Rosa's] reply brief, he drew on *Rodney* for its characterization of the relevant standard. *Rodney* is a case that draws upon *Miranda,* as well as *Innis* and *Muniz,* and

[Rosa's] brief referenced the *Rodney* court's citations to those cases.

*Rosa,* 2004 WL 736859, at \*6, U.S. Dist. LEXIS 5740, at \*16–\*17.

The point heading from Rosa's brief to the appellate division was as follows: "The court erred in denying defense counsel's motion to preclude [Rosa's] statement that his natural hair color was brown, where Detective Arroyo, who knew that [Rosa's] hair was brown, asked the blonde-haired [Rosa] his natural hair color while collecting pedigree information. U.S. Const., Amends. V, VI, XIV; N.Y. Const., Art. I, § 6." Under that heading, Rosa explicitly referred to the Constitutional Amendments that were cited in the point heading. Rosa's brief also contained a discussion of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and explained the state-law mechanism, under § 710.30, for precluding a statement obtained in violation of the rights guaranteed by *Miranda.*

Rosa also quoted Supreme Court precedent regarding the pedigree exception, *Pennsylvania v. Muniz,* 496 U.S. 582, 601–02, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). Indeed, the relevant federal constitutional standards were presented to the state courts by the State's reliance on *People v. Rodney,* 85 N.Y.2d 289, 624 N.Y.S.2d 95, 648 N.E.2d 471 (1995), in support of the State's argument regarding application of the pedigree exception. *Rodney* employs federal constitutional analysis and cites to applicable Supreme Court cases, and cases from this Court, regarding the pedigree exception. *See Rodney,* 85 N.Y.2d at 292–93, 624 N.Y.S.2d 95, 648 N.E.2d 471. Finally, Rosa's letter in support of his application for leave to appeal to the New York Court of Appeals claimed that his rights under the Fifth and Fourteenth Amendments of the Federal Constitution had been violated.

Accordingly, we agree with the District Court that Rosa exhausted his state remedies. He fairly presented his federal constitutional claims to the state courts, as he relied on (i) pertinent federal cases employing constitutional analysis; (b) state cases employing constitutional analysis in like fact situations; (c) terms so particular as to call to mind a specific right protected by the Constitution; and (d) allegations of a pattern of facts well within the mainstream of constitutional litigation. *See Daye,* 696 F.2d at 194.

### III. *Review Under AEDPA*

As Rosa filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the "standard for review by a district court in the first instance has been established by ... [AEDPA], as codified in 28 U.S.C. § 2254(d)." *Torres v. Berbary,* 340 F.3d 63, 67–68 (2d Cir.2003); *see also Vasquez v. Strack,* 228 F.3d 143, 147 (2d Cir.2000).

Under AEDPA, a federal court may grant a petition for habeas corpus notwithstanding a contrary state court adjudication on the merits, in accordance with the following provisions:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Assuming that a claim is not procedurally barred, "[w]ith respect to the elements of AEDPA deferential review set forth in § 2254(d)(1), a state court's decision is 'contrary to' clearly established Supreme Court precedent if 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Torres,* 340 F.3d at 68 (quoting *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). "And an [objectively] 'unreasonable application' of 'clearly established' Supreme Court precedent occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams,* 529 U.S. at 413, 120 S.Ct. 1495). "Although it is clear that the question is 'whether the state court's application of clearly established federal law was objectively unreasonable,' the precise method for distinguishing 'objectively unreasonable' decisions from merely erroneous ones is less clear." *Cotto,* 331 F.3d at 248 (citation omitted); *see also Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001). "However, it is well-established in [this] [C]ircuit that the 'objectively unreasonable' standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." *Cotto,* 331 F.3d at 248 (internal quotation marks omitted).

In *Lainfiesta v. Artuz,* 253 F.3d 151 (2d Cir.2001), this Court, relying principally on *Williams,* explained that:

A state court decision falls within the unreasonable application clause if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case. The Supreme Court has thus far offered little guidance as to the meaning of the term unreasonable application, tautologically instructing federal habeas courts to ask whether the state court's application was objectively unreasonable. The Supreme Court did caution, however, that an unreasonable application of federal law is different from an incorrect or erroneous application of federal law. Thus, a federal habeas court is not empowered to grant the writ when, in its independent judgment, it determines that the state court incorrectly applied the relevant federal law. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable. However, the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.

*Lainfiesta*, 253 F.3d at 155 (internal quotation marks and citations omitted). This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision. As this Court stated in *Sellan v. Kuhlman,*

> for the purposes of AEDPA deference, a state court "adjudicates" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

261 F.3d 303, 312 (2d Cir.2001); *see also Jones v. Stinson,* 229 F.3d 112, 119–21 (2d Cir.2000) (reversing the grant of habeas corpus because, though the appellate division's decision was questionable, it was not objectively unreasonable). In addition, a state court's determination of a factual issue is presumed to be correct, and is unreasonable only where the petitioner meets the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## IV. *Rosa's Response to the Pedigree Inquiry*

The State argues that the District Court, in granting Rosa's petition for habeas corpus, erred in determining that the state courts' decisions "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Specifically, the State argues that the appellate division reasonably applied federal law in ruling that "the officer's inquiry as to [Rosa's] actual hair color was reasonably related to administrative concerns, and was neither intended, nor reasonably likely, to elicit an incriminating response." *Rosa,* 294 A.D.2d at 160, 743 N.Y.S.2d 400, *aff'd,* 98 N.Y.2d at 732, 749 N.Y.S.2d 482, 779 N.E.2d 193.

 Generally, *"Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.... [T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably

likely to elicit an incriminating response from the suspect." *See Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *see also Muniz,* 496 U.S. at 600–01, 110 S.Ct. 2638; *accord United States v. Carmona,* 873 F.2d 569, 573 (2d Cir.1989); *United States v. Adegbite,* 846 F.2d 834, 838 (2d Cir.1988). The Supreme Court has explained that "any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining what the police reasonably should have known." *Muniz,* 496 U.S. at 601, 110 S.Ct. 2638 (internal quotation marks omitted).

[12] The collection of biographical or pedigree information through a law enforcement officer's questions during the non-investigative booking process that typically follows a suspect's arrest, however, does not ordinarily implicate the prophylactic protections of *Miranda,* which are designed to protect a suspect only during investigative custodial interrogation. Such interrogations customarily involve questions of a different character than those that are normally and reasonably related to police administrative concerns. *See id.* at 601–02, 110 S.Ct. 2638; *Carmona,* 873 F.2d at 573; *accord Rodney,* 85 N.Y.2d at 292–94, 624 N.Y.S.2d 95, 648 N.E.2d 471. In *Muniz,* the Supreme Court explained that "a routine booking question exception ... exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services" and that permissible questions include those that "appear reasonably related to the police's administrative concerns." 496 U.S. at 601–02, 110 S.Ct. 2638 (quotation marks omitted); *see also United States v. Gotchis,* 803 F.2d 74, 79 (2d Cir.1986); *cf. Rodney,* 85 N.Y.2d at 292–93, 624 N.Y.S.2d 95, 648 N.E.2d 471 (noting that "responses to routine booking questions—pedigree questions, as we have referred to them—are not suppressible even when obtained in violation of *Miranda*" and that such questions avoid any ground for challenging the voluntariness of a statement made in response to the questions).

■ Whether the information gathered turns out to be incriminating in some respect does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of *Miranda. See Gotchis,* 803 F.2d at 79 (affirming admission of defendant's response to a pedigree question, even though the response helped establish defendant's intent to commit the crime with which he was charged); *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1112 (2d Cir.1975) (affirming admission of defendant's response to a pedigree question, even though the response helped establish the identity of defendant as the rapist in question).

In this case, the appellate division correctly determined that Arroyo's "inquiry as to [Rosa's] actual hair color was reasonably related to administrative concerns, and was neither intended, nor reasonably likely, to elicit an incriminating response." *Rosa,* 294 A.D.2d at 160, 743 N.Y.S.2d 400. Arroyo and Fitzgerald were engaged in a routine administrative process, and the booking questions were presented to Rosa in the exact order that the questions appeared on the booking form and without any substantive deviation from the form of the questions presented. Spaces were provided on the form for the entry of basic identifying information, including Rosa's name, date of birth, age, race, height, weight, eye color, and hair color. Hair color—like eye color, skin tone, or other personal physical characteristics—is a common element of pedigree information. Proper completion of the booking form in this case required the officer to complete

the relevant portions of the form by filling in the correct information pertaining to the various elements that comprise the basic personal physical characteristics, including hair color. Moreover, if the officer perceives—either through direct observation or otherwise—that a specific piece of information provided by the arrestee is patently incorrect, then it is not only reasonable, but arguably the officer's duty, to inquire further.

We hold that Arroyo was engaged in a booking process that was reasonably related to police administrative concerns. But of course "recognizing a booking exception to Miranda does not mean . . . that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." *Muniz*, 496 U.S. at 602 n. 14, 110 S.Ct. 2638; *see also LaVallee*, 521 F.2d at 1113 n. 2 ("We recognize that this exception to *Miranda* lends itself to the possibility of abuse by police who might, under the guise seeking pedigree data, elicit an incriminatory statement.").

To determine whether the police abused the gathering of pedigree information in a manner that compels *Miranda* protection requires an objective inquiry: Should the police have known that asking the pedigree questions would elicit incriminating information? *See Innis*, 446 U.S. at 302, 100 S.Ct. 1682 ("[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (emphasis in original)); *cf. United States v. Mata–Abundiz*, 717 F.2d 1277, 1280 (9th Cir.1983) ("The test is objective. The subjective intent of the agent is relevant but not conclusive.").

The pedigree question here was not: "When did you dye your hair?" Rather, the question—"What is your real hair color?"—was narrowly crafted by the officer to obtain information necessary to complete the booking form. The likely answer that an officer in Arroyo's position would, or should, have expected is a one-word description of the accurate hair color (e.g., "brown" or "blonde"). Here, Rosa not only responded to the question but also volunteered a response beyond the scope of the question. Rosa provided, without elicitation from Arroyo, the additional information that he "dyed it yesterday." The fact that Rosa's hair was dyed a different color was not necessarily incriminating. Rather, submitted to the jury as possible evidence of Rosa's consciousness of guilt was the fact that he had dyed his hair in *conjunction* with the fact that he had dyed it *recently*—indeed, on the day of the robbery. But Rosa offered the critical piece of timing-related information voluntarily and outside the scope of the question. Thus, his entire response, including the damning portion, clearly was admissible. *See Innis*, 446 U.S. at 299–300, 100 S.Ct. 1682.

In addition to admitting that he had dyed his hair, Rosa's response provided Arroyo with information pertaining to when Rosa dyed his hair. Arroyo, however, could not reasonably have expected Rosa to offer additional inculpatory information that was outside the scope of the question. Indeed, requiring an officer to be on guard at all times for responses outside the scope of the booking questions would allow suspects to circumvent or hinder the police administrative process. *See Innis*, 446 U.S. at 302, 100 S.Ct. 1682 ("[T]he police surely cannot be held accountable for the unforeseeable results of their words or actions . . . ."). In any event, the fact that Rosa's hair was dyed is

not a tell-all piece of evidence demonstrating his guilt—it was merely a piece of evidence supporting Hernandez' identification of Rosa as the individual who had robbed her. *See Gotchis,* 803 F.2d at 78.

We hold that the appellate division's decision in Rosa's case did not "involve[ ] an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As such, we conclude that the District Court incorrectly determined (i) that Rosa's response was the product of investigative custodial interrogation that was likely to produce or elicit an incriminating response, and (ii) that the state courts' application of federal law in this case was objectively unreasonable.

Accordingly, the judgment of the District Court granting the writ of habeas corpus is reversed.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the District Court.

STRAUB, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that Rosa exhausted his *Miranda* claim in state court. However, because I do not agree with the majority's conclusion on the merits of Rosa's claim, and because I do not believe that the constitutional error was harmless, I would affirm the District Court's grant of the writ.

## I. Constitutional Error

At issue is whether Detective Arroyo should have known that his question— "what is your real hair color?"—was likely to elicit an incriminating response from Rosa. The majority reasons that "[t]he likely answer that an officer in Arroyo's position would, or should, have expected is a one-word description of the accurate hair color (e.g., 'brown' or 'blonde')." *Ante* at 222. According to the majority, the incriminating portion of Rosa's response was not his statement that his real hair color was brown, but rather was his statement that he had dyed his hair the day before. The majority asserts that Rosa's statement that he "dyed it yesterday" was "beyond the scope of the question" posed by Arroyo, and Arroyo "could not reasonably have expected Rosa to offer additional inculpatory information that was outside the scope of the question." *Ante* at 222.

I agree with the majority that Arroyo may not have expected Rosa to volunteer the particularly incriminating statement regarding *when* he had dyed his hair. What the majority does not recognize, however, is that *any* answer responsive to the question "what is your real hair color?" would have constituted an "incriminating response" as the Supreme Court has defined that term. In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court explained that interrogation for *Miranda* purposes means words or actions of the police that "the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682 (footnote omitted). The Court explained that "[b]y 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.* at 301 n. 5, 100 S.Ct. 1682. The Court in *Innis* pointed to its discussion in *Miranda* of incriminating statements:

"[N]o distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by

the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement."

*Id.* (quoting *Miranda v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

Under the Supreme Court's definition of "incriminating response," any answer Rosa gave that was responsive to Arroyo's question would have been an incriminating response. Rosa could have: (1) answered truthfully that his real hair color was brown, and the state could have used that response to prove that his real hair color matched the description of the robber given by the victim, Hernandez, *see* Appellee's Br. at 32 ("[The] anticipated response, brown hair, which provided a descriptive match, easily satisfies *Innis*'s definition of 'incriminating' ...."); (2) lied and said his hair was really blonde, and the state could have used the answer against him at trial, *see Miranda,* 384 U.S. at 477, 86 S.Ct. 1602 ("[S]tatements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication ...."); or (3) claimed that his hair was some other color, resulting in the same problem as in (2).

Although Arroyo may not have anticipated that Rosa would make the particularly incriminating admission that he dyed his hair the day before, Arroyo certainly should have anticipated that his question was likely to elicit an incriminating response. As the majority recognizes, Arroyo likely expected a one-word descrip-

tion of hair color—e.g., "brown" or "blonde." *Ante* at 222. As I have explained, such a response—while not as highly incriminating as the response Rosa actually gave—would still have constituted an incriminating response.

Arroyo should have expected that his question about real hair color was likely to elicit an incriminating response because he knew—or should have known—that hair color was a central issue in the case. Arroyo observed at the time of booking that Rosa's hair was "bright blonde." The day before, after obtaining a description of the robber from Hernandez, Arroyo had recorded in the complaint report that the robber's hair was brown. Although Hernandez identified Rosa the day after the robbery as the man who had robbed her, Rosa's hair color did not match the description Hernandez gave to Arroyo the day before. Thus, the problem with Hernandez's identification of Rosa should have been immediately apparent to Arroyo. Establishing that Rosa's real hair color was brown (or at least that it was not bright blonde) was central to proving that Rosa was the robber. Indeed, the majority acknowledges that this information strengthened Hernandez's identification. *Ante* at 222 ("[T]he fact that Rosa's hair was dyed is not a tell-all piece of evidence demonstrating his guilt—it was merely a piece of evidence supporting Hernandez' identification of Rosa as the individual who had robbed her."). Under these circumstances, Arroyo should have realized that his question would either elicit a response from Rosa that strengthened Hernandez's identification, or would catch Rosa in a lie.

Although in many situations officers may be able to question arrestees about their real hair color as part of the booking process without the need for *Miranda* warnings, under the particular circumstances of this case, Arroyo plainly should

have been aware that a question relating to real hair color was likely to elicit an incriminating response from Rosa. Therefore, before he asked the question, Arroyo should have given Rosa his *Miranda* warnings and obtained an effective waiver. Because he did not do so, Rosa's statement should have been suppressed at trial.

The fact that a question is asked during booking does not immunize it from *Miranda*. In a case such as this, where the officer questioning a suspect should know, at the time he asks his question, that the question is likely to elicit an incriminating response, *Miranda* warnings must be given before the question is posed. I do not believe that this places an unreasonable burden on police officers. Where *Miranda* warnings have not been given, an officer must give some thought to questions posed.

I agree with the District Court that Arroyo plainly should have known that his question was likely to elicit an incriminating response. I find unreasonable the Appellate Division's conclusion that Arroyo's question was not reasonably likely to elicit an incriminating response, *see People v. Rosa*, 294 A.D.2d 159, 160, 743 N.Y.S.2d 400, 401 (1st Dep't 2002), and therefore I believe that the state court's adjudication of the claim "resulted in a decision that ... involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## II. Harmless Error Review

I do not believe the constitutional error in admitting Rosa's statement was harmless.

This Court has not yet decided what harmless error standard applies when a constitutional error is being evaluated for harmlessness for the first time on federal habeas review of a state court conviction. On direct appeal, courts apply the standard set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which provides that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. 824.

In 1993, the Supreme Court held in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), that *Chapman* did not apply on collateral review. Rather the standard to be applied is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

After the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 100 Stat. 1214 (1996), it was "an open question in this circuit whether, following the passage of AEDPA, the applicable test on habeas review of a state conviction remains the one set forth in *Brecht*, or instead should be a determination whether the state court's decision was contrary to, or involved an unreasonable application of *Chapman*." *Brown v. Keane*, 355 F.3d 82, 91 (2d Cir.2004) (internal quotation marks omitted). We recently resolved part of that question by holding "that when a state court explicitly conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied *Chapman*." *Gutierrez v. McGinnis*, 389 F.3d 300, 306 (2d Cir.2004); *see also Zappulla v. New York*, 391 F.3d 462, 467 (2d Cir.2004).

In the present case, the Appellate Division did not conduct harmless error re-

view,[2] and thus *Gutierrez* does not resolve what standard to apply. In *Gutierrez,* we noted that we were not reaching the issue of what standard to apply "where the state court has not engaged in harmless error review." *Gutierrez,* 389 F.3d at 306.

The state urges us to apply the harmless error standard set forth in *Brecht.* Rosa argues that *Chapman* applies where a state appellate court did not engage in harmless error review. According to Rosa, the reason for the more deferential standard in *Brecht* was that the state courts in that case had engaged in harmless error review. Neither party argues that the proper standard is whether the state appellate court unreasonably applied *Chapman.*

I do not resolve which of the possible harmless error tests apply, because I think under any of tests the constitutional error was not harmless.

"In making a determination of harmless error, the court looks to the record as a whole, considering the overall strength of the prosecution's case, the importance of the improperly admitted evidence, and whether the evidence was emphasized at trial." *Brown,* 355 F.3d at 92.

The state's case against Rosa rested entirely on Hernandez's identification of Rosa as the armed robber. There was no physical evidence or other testimony linking Rosa to the crime.

Hernandez testified at trial that during the course of the robbery, a man pushed her up against a car, grabbed her case containing jewelry, and pointed a pistol at her stomach. Hernandez said that the robbery lasted for approximately three minutes and she was nervous during the incident. Hernandez said that she had not seen the robber before the day of the robbery, but she had seen him earlier that day on the street.

Hernandez further testified that she told Arroyo after the robbery that the robber had "fallen" eyes, an unshaven look, chubby cheeks, medium length hair that was brown with light tips, and full lips. Hernandez said that she had not described the robber as "pale." However, the defense established that the complaint report written by Arroyo on the day of the robbery, which was based on Hernandez's statements, included no details about fallen eyes or chubby cheeks. The report said that the robber had short hair, a mustache, and fair complexion.

Hernandez testified that she saw Rosa on the street the day after the robbery and identified him as the robber. According to Hernandez, Rosa's hair at that time was a different color than at the time of the robbery. At trial, Hernandez identified Rosa as the armed robber. Hernandez said that Rosa's appearance in court was different from the day of the robbery because in court he had a goatee and his hair was a different color. In addition, Hernandez said that the robber's hair covered his forehead whereas in court Rosa's hair was pulled back.

Although the defense was able to raise questions about Hernandez's identification of Rosa as the robber, the defense had to contend with Arroyo's testimony that Rosa had admitted that his real hair color was brown and that he had dyed it on the day of the robbery. In closing arguments, the state argued: "The defendant himself,

---

**2.** The Appellate Division rejected Rosa's constitutional claim on the ground that admitting Rosa's statement at trial was not error because "the officer's inquiry as to defendant's actual hair color was reasonably related to administrative concerns, and was neither intended, nor reasonably likely, to elicit an incriminating response." *Rosa,* 294 A.D.2d at 160, 743 N.Y.S.2d at 401.

through his actions and through his words, confirmed that he is the person who robbed Juana Hernandez .... He dyed his hair blond to conceal his identity so he wouldn't get caught." The state repeatedly emphasized Rosa's statement that he had dyed his hair "yesterday" or "last night," and urged that "those actions of the defendant, dying [sic] his hair bright blond the day after he robbed Juana Hernandez, that is evidence of the defendant's guilty conscience." Finally, the trial court instructed the jury that it could consider Rosa's statement regarding "having dyed his hair and when" as proof of his consciousness of guilt. However, the court warned the jury that "proof of conduct evidencing consciousness of guilt has slight value" and that "[s]tanding alone, such evidence may never be made a basis for the finding of guilt."

On appeal, the state argues that even if Rosa's statement had been excluded, the jury could have concluded that Rosa had dyed his hair after the robbery to conceal his identity. Hernandez testified that Rosa's hair was a different color the day of the robbery than the day of the arrest. The state points out that Officer O'Shea testified that on the day of Rosa's arrest, Rosa's hair was "bleached or dyed blonde," and that Arroyo testified that Rosa's hair that day was "real bright flaming yellow." The state asserts also that Rosa's arrest photograph showed him with bright yellow hair and no visible roots. Finally, the state argues that the jury would have seen that Rosa's hair was dark at trial. Therefore, according to the state, even if Rosa's statement had been excluded, the jury could have concluded that Rosa dyed his hair after the robbery.

Without Rosa's statement, however, the jury would have had to arrive at its own conclusion regarding when Rosa dyed his hair. Rosa could have dyed his hair a week earlier and still had bright blonde hair with no visible roots on the day that he was arrested. Rosa's statement that his real hair color was brown and that he had dyed it the day before not only corroborated Hernandez's identification of Rosa as the robber but was also strong evidence that Rosa had dyed his hair to avoid being identified. Rosa's statement was highly incriminating, which is why the state fought to have it admitted and emphasized it so strongly in its closing.

In sum, the state's evidence was far from overwhelming, and without Rosa's statement, its case would have been quite weak. I agree with the District Court that Rosa's acknowledgment that his real hair color was brown and that he had dyed it on the day of the robbery may well have made the difference. Because I believe that the admission of the statement had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 638, 113 S.Ct. 1710, and could not reasonably be found to be "harmless beyond a reasonable doubt," *Chapman*, 386 U.S. at 24, 87 S.Ct. 824, I would affirm the grant of the writ.