16-4206-cr
United States v. Jacques Durand

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 15th day of April, two thousand nineteen.

PRESENT:  JOSÉ A. CABRANES,
          ROSEMARY S. POOLER,
          CHRISTOPHER F. DRONEY,
            *Circuit Judges*.

———————————————————————

UNITED STATES OF AMERICA,

       *Appellee*,

    v.

                                       No. 16-4206-cr

JACQUES DURAND,

       *Defendant-Appellant*.

———————————————————————

FOR APPELLEE:               J. MATTHEW HAGGANS, (Susan Corkery, *on the brief*), Assistant United States Attorneys *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, NY.

1

FOR DEFENDANT-APPELLANT:        ALLEGRA GLASHAUSSER, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Glasser, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the case is **REMANDED** to the district court for an evidentiary hearing on Defendant-Appellant's motion to suppress.

In 2016, Defendant-Appellant Jacques Durand was convicted by a jury of thirteen counts of access device fraud in violation of 18 U.S.C. § 1029, and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). A judgment was entered on December 12, 2016, sentencing Durand to 51 months' imprisonment, as well as a term of supervised release, restitution, and forfeiture. During their investigation, postal inspectors obtained un-*Mirandized* statements from Durand that linked him to the offense conduct. These statements were introduced at trial. Durand had filed a pre-trial motion to suppress those statements, which the district court denied without an evidentiary hearing, concluding that Durand's statements merely contained pedigree information and therefore *Miranda* warnings were not required. Durand now appeals the denial of his motion to suppress. For the reasons that follow, we **REMAND** for a suppression hearing.

## Background[1]

During the winter of 2014, inspectors of the United States Postal Investigation Service began investigating complaints of mail theft and identity fraud in Queens and Nassau Counties, New York. The postal inspectors had received reports from local residents that fraudulent credit cards had been issued in their names, stolen from their mailboxes, and then used to make substantial purchases and cash withdrawals. One complainant provided inspectors with a physical description of the perpetrator, which was based on her mother's observation of the perpetrator removing mail from their mailbox on two occasions. The complainant also told the inspectors that members of her family had credit cards issued in their names without their authorization.

Citibank, Capital One Bank, and Bank of America—financial institutions affected by the identify fraud—assisted the investigation in two ways. First, the banks' fraud detection units informed the inspectors that these fraudulent credit cards issued to the complainant's family and others were used at ATMs serviced by JPMorgan Chase Bank,

---

[1] Because there was no evidentiary hearing on Durand's motion to suppress, the following facts are derived from pre-trial hearings, trial testimony, and the government's affidavit in support of a warrant application to search Durand's cellphone.

NA and Capital One Bank. These ATM branches then provided inspectors with surveillance photographs depicting a person who matched the complainant's description of the person provided by the initial complainant.

Second, the banks provided the inspectors with logs of the phone numbers used to call the banks about the fraudulent credit card accounts. If the inspectors could link a person to one of the telephone numbers they identified as connected to the fraudulent accounts, then they could likely identify the person obtaining the fraudulent credit cards. The inspectors ultimately created a list of five or six telephone numbers, obtained from the banks' telephone logs, that were likely connected to that person.[2]

In addition to phone numbers and surveillance photos, inspectors also linked the person who obtained the fraudulent credit cards to a black Nissan Maxima. In April 2015, a letter carrier reported that she had been followed "by a black male individual driving a black Nissan Maxima bearing the Massachusetts license plate 5YSV20." Gov't App'x at 4. She observed the driver of the car approach mailboxes in Elmont, Nassau County. *Id.* The inspectors ran the Nissan's license plate number through a license plate recognition database and discovered the car "was frequently parked near the corner of Ocean Avenue and Albemarle Road in Brooklyn, New York." *Id*. Inspectors eventually located the car in Brooklyn, during surveillance of the area, and learned that its driver, later discovered to be Durand, matched the physical appearance of the person recorded by the JPMorgan and Capital One ATMs and described by the initial complainant.

On June 9, 2015, postal inspectors again spotted the black Nissan Maxima in Brooklyn and arrested Durand as he was entering the car on an outstanding state arrest warrant for unrelated state charges. The inspectors handcuffed Durand and transported him to a postal inspection field office in Garden City, New York, where he was taken to an interview room and questioned. Durand was not read his *Miranda* rights prior to his questioning.

During the interview, inspectors asked Durand for his social security number, his address, his employment status, and finally for his telephone number. Durand resisted

---

[2] The government does not contest that "officers had been investigating the defendant for some months and had obtained a list of phone numbers." App'x at 29. Indeed, at trial the following exchange occurred between the Assistant U.S. Attorney and one of the inspectors:

Q[:] And how many phone numbers, again, prior to June 9, 2015, did you have reason to believe might be associated in some way with the credit card accounts charged in this case?

A[:] Five, six, possibly.

App'x at 76.

3

answering these questions. As to his telephone number, Durand first provided a phone number ending in "7996." The inspectors tried calling the number and discovered it had been disconnected. After accusing Durand of lying, the inspectors asked Durand for the number of the cellphone he was then carrying. Durand provided a number ending in "9768," which the inspectors then tried. This time Durand's phone rang. The inspectors then *Mirandized* Durand, after which Durand requested an attorney. Durand was then transferred to the Nassau County Police Department, apparently to face the state charges. It was not until September 15, 2015, that Durand was charged in a criminal complaint with the federal charges that were the basis for his convictions.

The telephone number Durand provided in his interview proved to be critical to the inspectors' investigation and the resulting prosecution. Analysis of the number's call history obtained from Durand's cell phone carrier matched the call logs previously provided by Capital One Bank, JPMorgan Chase Bank, and Bank of America, showing that the "9768" number had been used in connection with the fraudulent credit card accounts.

Before trial, Durand moved to suppress the statements regarding the cellphone number he gave inspectors at his interview. He claimed it was the product of an un-*Mirandized* custodial interrogation. The district court denied the motion without an evidentiary hearing, concluding it was unnecessary:

> [t]o go on and elaborate about the fact that there is no necessity to provide *Miranda* warnings with respect to pedigree information. Asking for a telephone number is certainly part of pedigree information [because] [i]t's important that law enforcement know where they may contact a person who is under arrest or is being investigated should they need him.

App'x at 32.

In its summation at trial, the government asserted that connecting Durand to the "9768" number "broke the case wide open," *id.* at 175, and that Durand used the "9768 phone[] to call" about the accounts. *Id.* at 160. The government further argued that "the evidence prove[d]" Durand was guilty of fraud "because it was his phone" that called about the fraudulent accounts. *Id.* at 162.

On June 30, 2016, the jury convicted Durand of thirteen counts of access device fraud and one count of aggravated identity theft based on the fraudulent credit cards, but acquitted Durand of mail theft. Durand timely appealed the district court's judgment.

## Discussion

We are presented with one question on appeal: Whether the district court erred by admitting Durand's pre-*Miranda* statements to postal inspectors regarding his cellphone number.

Durand made a sufficient showing to the district court to require an evidentiary hearing on whether the postal inspectors' questioning violated his Fifth Amendment protection from self-incrimination. The Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To preserve this right in the interrogation room, "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation[,] . . . of [his] right to remain silent[,] and that anything stated can be used in evidence against him" before he is questioned. *Miranda v. Arizona*, 384 U.S. 436, 471 (1966).

This suite of protections, known as *Miranda* warnings, is "an absolute prerequisite to" custodial interrogation.[3] *Id.* at 471. In this context, interrogation refers both to "questioning initiated by law enforcement officers after a person has been taken into custody," *id.* at 444, and to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Not all questions require *Miranda* warnings, however. Under *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), officers are not required to give *Miranda* warnings for "routine booking question[s] . . . reasonably related to the police's administrative concerns" and used "to secure the biographical data necessary to complete booking or pretrial services," so long as the questions are not "designed to elicit incriminating admissions." 496 U.S. at 601–02 & n.14 (internal quotation marks omitted).

In applying *Muniz*, we have explained that an officer cannot ask a pedigree question, even if it otherwise might fall within the booking exception, if she knows or should have known the question was reasonably likely to elicit an incriminating response. *See Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir. 2005); *see also United States v. Williams*, 842 F.3d 1143, 1146–47 (9th Cir. 2016) ("The booking questions exception . . . is subject to an important qualification: When a police officer has reason to know that a suspect's answer may incriminate him . . . even routine questioning may amount to interrogation."(internal quotation marks omitted)).

---

[3] The Government does not dispute that Durand was in custody at the time he was questioned by the postal inspectors.

5

Thus, the booking exception to *Miranda* applies only when three elements are satisfied: (1) the question asked by law enforcement seeks "biographical data necessary to complete booking or pretrial services," (2) "'appear[s] reasonably related to the police's administrative concerns,'" *and* (3) the question is not likely to elicit an incriminating response. *Rosa*, 396 F.3d at 221.

A court must ordinarily hold "[a]n evidentiary hearing on a motion to suppress . . . if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (quoting *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir. 1979)); *see also In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 165 (2d Cir. 2008); *United States v. Rivera*, 321 F.2d 704 n.1 (2d Cir. 1963) ("Obviously . . . the moving party must make a preliminary showing as to the circumstances of [an alleged Fourth Amendment violation] sufficient to raise a question as to its legality.").

Because Durand sufficiently demonstrated to the district court that the postal inspectors were investigating the mail and identity fraud crimes for months and that the inspectors knew before his interview a small number of phone numbers were critical to their investigation (as one inspector would later state in an affidavit, the inspectors were aware that such phone numbers have significant investigative value in identity fraud cases), Durand at least alleged a sufficient basis to raise the evidentiary issue of whether the inspectors' questions about his phone number were reasonably likely to elicit incriminating information, and thus violated the Fifth Amendment.[4] *See Williams*, 842 F.3d at 1147 (finding that the booking exception does not apply where the police suspect an individual of a crime and ask a biographical question likely to confirm or deny that suspicion).

We thus remand for the district court to hold a suppression hearing as expeditiously as possible, but no later than 60 days after the mandate issues. The district court is directed to determine if the questions at issue that proceeded the issuing of *Miranda* warnings to Durand were asked as part of a "non-investigative booking process," "appeared reasonably related to [the postal inspectors'] administrative concerns," and were not likely to elicit incriminating information. *Rosa*, 396 F.3d at 221.[5] If the motion to suppress is granted,

---

[4] *Rosa* is not to the contrary. There we held that an officer's question—"What is your real hair color?"— fell within the booking exception to *Miranda* even though the officer had previously received a report containing the suspect's hair color because it was asked pursuant to a standard booking form and because it did not by itself call for an incriminating answer. *Rosa*, 396 F.3d at 213, 222-23. Rather, information volunteered by the defendant in addition to his answer to the officer's question inculpated the defendant. *Id.* at 222-23.

[5] The government has asserted that, under the inevitable discovery doctrine, even if the postal inspectors violated Durand's Fifth Amendment protections, we need not suppress his phone number because the government would have inevitably discovered it. This argument also requires a fact-intensive inquiry we

Durand would be entitled to a new trial at which the disputed evidence could not be introduced. If the motion to suppress is denied, his conviction will stand and he may take an appeal from that denial. Such appeal would be referred to a new panel in the ordinary course.

The case is remanded for a prompt suppression hearing consistent with this order. The mandate shall issue forthwith.

## Conclusion

We have considered the government's remaining arguments and find them to be without merit. We thus **REMAND** to the district court for a suppression hearing.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

---

leave to the district court. *See United States v. Stokes*, 773 F.3d 438, 444 (2d Cir. 2013); *see also Nix v. Williams*, 467 U.S. 432, 444 n.5 (1984).